UNITED STATES of America,
Plaintiff-Appellee,

v.

James Bazel CARTER, a/k/a "Red", Lemuel Sellers Morris, Thomas Edgar Morris, Larry W. Jackson, James Holt Griffin, James Washington Griffin, a/k/a "J.W.", Suzette Slade Jackson, Joe Veston Lightsey, Charlotte Lightsey, and Robert Wayne Sapp, Defendants-Appellants.

No. 82-8053.

United States Court of Appeals,
Eleventh Circuit.

Jan. 13, 1984.

**1518**

Ronald A. Dion, North Miami Beach, Fla., for Carter.

Lewis M. Groover, Jr., Atlanta, Ga., court-appointed, for Sapp.

William H. Glover, Jr., Brunswick, Ga., court-appointed, for James Holt Griffin.

Edward T.M. Garland, Steven H. Sadow, Atlanta, Ga., for Lemuel Morris and James W. Griffin.

M. Theodore Solomon, Alma, Ga., for Thomas Morris.

Robert Killian, Brunswick, Ga., court-appointed, for Joe V. Lightsey.

John P. Rivers, Brunswick, Ga., court-appointed, for Charlotte Lightsey.

Frank J. Pretrella, Atlanta, Ga., for Larry and Suzette Jackson.

Mervyn Hamburg, Crim. Div., Washington, D.C., for plaintiff-appellee.

Before JOHNSON and HENDERSON, Circuit Judges, and ALLGOOD *, District Judge.

JOHNSON, Circuit Judge:

## I. INTRODUCTION

Typical of prosecutions under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C.A. §§ 1961 *et seq.,* the present case involves ten appellants charged and convicted under various counts of a seven count indictment; the common thread connecting the appellants is found in their association with and participation in a drug smuggling and bribery ring operating in and around Appling County, Georgia. Untangling the skein of the various challenges to their convictions raised by the appellants,[1] we begin at the beginning of the prosecution. The indictment presented to the jury in this case[2] charged twelve defendants, including the ten appellants, with various crimes arising from the drug smuggling and bribery activities. Count One, on which eight appellants were charged and convicted, charged conspiracy to violate RICO, in violation of 18 U.S.C.A.

---

* Honorable Clarence W. Allgood, U.S. District Court Judge for the Northern District of Alabama, sitting by designation.

1. Although on certain issues duplicating arguments are made by other appellants, the combined total of the ten appellants' arguments in brief is forty-seven. Additionally, all but four of the appellants adopt the arguments raised by co-appellants.

2. The original indictment returned charged eighteen defendants in ten counts. Thirteen defendants were tried together. At the close of the government's case, the court dismissed without objection the one charge against co-defendant Johnny Morris. A redacted version of the original indictment, omitting the counts not pertaining to the defendants on trial, the names of the defendants not on trial, and the charge pertaining to Johnny Morris, was presented to the jury. Eleven defendants were convicted on each of the counts with which they had been charged. Co-defendant Arlton Z. Jackson, charged only in Count Seven, was acquitted by the jury. All eleven of the convicted defendants appealed; the motion of appellant James Ricky Williams to dismiss his appeal was granted by this Court.

§ 1962(d).[3] Counts Two through Four, on which nine appellants were charged and convicted, charged possession of marijuana with intent to distribute, and aiding and abetting in the possession of marijuana with intent to distribute, in violation of 21 U.S.C.A. § 841(a)(1) and 18 U.S.C.A. § 2. Count Five, on which only appellant Charlotte Lightsey was charged and convicted, charged perjury before a grand jury, in violation of 18 U.S.C.A. § 1623. Count Six, on which only appellants Larry and Suzette Jackson were charged and convicted, charged tax evasion, in violation of 26 U.S.C.A. § 7201. Count Seven, on which only appellant Larry Jackson was charged and convicted, charged filing a false federal tax return, in violation of 26 U.S.C.A. § 7206(1).[4]

Each appellant challenges his or her convictions on numerous and varied grounds, some common to those of other appellants convicted on the same count, and others necessarily unique to each appellant. Generally, these challenges fall into one of six main categories: 1) the admissibility of recorded conversations between certain appellants and a co-conspirator; 2) challenges to the RICO conspiracy convictions; 3) sufficiency of the evidence to convict appellants on various counts; 4) the propriety of

---

3. 18 U.S.C.A. § 1962(d) provides that:
 It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.
 Appellants were charged with conspiring to violate 18 U.S.C.A. § 1962(c). Section 1962(c) provides that:
 It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

4. The United States District Court for the Southern District of Georgia imposed the following sentences:
 Lemuel Morris: Imprisonment for twenty years and a $25,000 fine on Count One; consecutive terms of imprisonment for fifteen years and consecutive fines of $125,000 on Counts Two through Four. The prison terms on Counts Two through Four are concurrent with the sentence under Count One. The aggregate sentence is forty-five years imprisonment and a $400,000 fine.
 Thomas Morris: Imprisonment for twenty years and a $25,000 fine on Count One.
 Larry Jackson: Imprisonment for twenty years and a $25,000 fine on Count One; consecutive terms of imprisonment for fifteen years and consecutive $125,000 fines on Counts Two through Four; concurrent terms of imprisonment for five years on Count Six, and three years on Count Seven. All fines are cumulative; the sentence imposed on Count One is concurrent with the sentences imposed on Counts Two through Four. The aggregate sentence is imprisonment for forty-five years and a $400,000 fine.
 James Carter: Imprisonment for twenty years on Count One; imprisonment for fifteen years on Count Three; fines of $25,000 on Count One, and $125,000 on Count Three. The prison terms and fines are consecutive. The aggregate sentence is imprisonment for thirty-five years and a $150,000 fine.
 James H. Griffin: Consecutive terms of imprisonment for ten years on Counts Two and Three; consecutive fines of $50,000 on each Count. The aggregate sentence is imprisonment for twenty years and a $100,000 fine.
 James W. Griffin: Imprisonment for ten years and a $25,000 fine on Count Two.
 Suzette Jackson: Imprisonment for twenty years and a $25,000 fine on Count One; concurrent terms of imprisonment for fifteen years and consecutive fines of $125,000 on Counts Two and Three; imprisonment for five years and a $10,000 fine on Count Six, with the prison term to run concurrently with the sentence imposed on Count One but consecutively to the sentences imposed on Counts Two and Three. All fines are cumulative. The sentences imposed on Counts Two and Three are concurrent to that under Count One. The aggregate sentence is imprisonment for twenty years and a fine of $285,000.
 Joe Lightsey: Consecutive terms of imprisonment for fifteen years on Counts One through Three; cumulative fines of $25,000, $125,000 and $125,000 on these three counts. The aggregate sentence is imprisonment for forty-five years and a fine of $275,000.
 Charlotte Lightsey: Concurrent terms of imprisonment for fifteen years on Counts One and Two and a consecutive term of imprisonment for five years on Count Five. A $125,000 fine imposed on Count Two. Aggregate sentence of imprisonment for twenty years and a $125,000 fine.
 Robert Wayne Sapp: Consecutive terms of imprisonment of ten years on Counts One and Two and cumulative fines of $25,000 and $75,000. Aggregate sentence of imprisonment for twenty years and a $100,000 fine.

cumulative sentences for RICO conspiracy and possession of marijuana with intent to distribute imposed on certain appellants; 5) the alleged denial of certain appellants' right to conflict-free counsel; and 6) tax issues raised by appellants convicted on Counts Six and Seven. We address these contentions seriatim and, after a careful review of the record, affirm each appellant's conviction on each count charged in the indictment, with the exception of the convictions of Larry and Suzette Jackson on Count Six, which we reverse.

## II. THE FACTS

Simply stated, this case involves the association of a group of persons with the common objective of profiting from criminal activity entailing drug smuggling and bribery. The facts pertinent to each appellant's role and participation in this objective are here set forth.

### A. The Setting

Appellants Lemuel and Thomas Morris owned the Morris Brothers Dairy Farms, Inc., located twenty miles south of Baxley, in Appling County, Georgia, a largely rural area. Prior to March of 1980, an airstrip was constructed on an open field that was part of the dairy farm. This airstrip was used to land planeloads of marijuana and hashish for both Larry Jackson and Lemuel Morris, leaders of the smuggling operation. Access to the airstrip on the dairy farm was provided by a dirt road adjacent to Thomas Morris' house. A stash house for the drugs prior to distribution was located nearby.

### B. The Actors

The individuals involved in the drug smuggling and bribery operations can be divided into two groups: those who participated in the drug smuggling and bribery, and the law enforcement officials who provided protection for the drug smuggling activities. In the first group, Larry Jackson and Lemuel Morris were the leaders of the operations. Larry Jackson, a resident of Baxley, Appling County, Georgia, received the air shipments of drugs, stored them and arranged for their distribution. His partner, George Mitchell, a resident of Miami, Florida, arranged for the importation and delivery of the drugs to Appling County. Larry Jackson was instrumental in bribing law enforcement officials for protection of the drug smuggling. Lemuel Morris provided the airstrip necessary for deliveries to both Larry Jackson and himself, and bribed law enforcement officials for protection. Suzette Jackson, Larry Jackson's wife, was the group's bookkeeper, handled the money, and was present during deliveries. The other appellants played lesser roles in the group's affairs. James "Red" Carter, the former sheriff of Appling County, worked at the dairy farm and participated in deliveries to the airstrip; he also unsuccessfully attempted to bribe the Sheriff of Wayne County, Georgia, to permit the use of an airport in Wayne County for deliveries of marijuana without fear of arrest. Robert Wayne Sapp, who occasionally worked at the dairy, was an unloader for the drug shipments. James Holt Griffin refueled the airplanes and helped unload the drugs. James Washington "J.W." Griffin stored fuel for the airplanes and was present during the deliveries. Thomas Morris, Lemuel Morris' brother, was a co-owner of the dairy farm, the property upon which the airstrip and stash house were located, and managed its affairs.

The next group of individuals involved in the drug smuggling operations included the law enforcement officials who provided protection for the deliveries on the airstrip in return for bribes. Joe Lightsey, the sheriff of Appling County, headed this group. His wife, Charlotte Lightsey, monitored the police radio from her station in the sheriff's office when planeloads of marijuana were scheduled to arrive, and was present during meetings between Joe Lightsey and the other law enforcement officials that involved setting up the protection for deliveries. Larry Carter, Lightsey's deputy, and Rayford Phillips, a Georgia Bureau of Investigation agent assigned to Appling County, provided protection and participated in the drug smuggling operations; they were paid on behalf of Larry Jackson and Lemuel Morris by Joe Lightsey. Both

Larry Carter and Rayford Phillips testified on behalf of the government at appellants' trial.

### C. Act One

At least as early as 1979, Larry Jackson and George Mitchell were bringing drugs into Appling County, Georgia. In December of 1979, Larry Jackson purchased approximately 2,000 gallons of airplane fuel from a company owned by Suzette Jackson, then Suzette Slade. This fuel was stored at J.W. Griffin's farm. Prior to March of 1980, the airstrip was constructed on the dairy farm, and the Morris-Jackson operation began.

In May of 1980, Joe Lightsey, Larry Carter and Rayford Phillips discussed joining Larry Jackson's drug business, and in early August all three met with Larry Jackson in a cemetery near Jackson's house. At this meeting, Jackson told them that they could earn anywhere from $5,000 to $10,000 each on every load of marijuana that came in by monitoring the police radio during the delivery of shipments and reporting the presence of the authorities. Larry Jackson told them he was expecting a shipment any day.

On the afternoon of August 29, 1980, Phillips and Larry Carter met with Joe Lightsey and Charlotte Lightsey in Charlotte Lightsey's office at the sheriff's department. Joe Lightsey told them that a load of marijuana would be arriving that night and arranged a meeting with Phillips and Carter to discuss the details. Joe Lightsey directed Carter to call the regularly scheduled sheriff's radio operator for that night and arrange for Charlotte Lightsey to monitor the radio and notify them if any calls came in about the drug delivery.

Larry Carter and Phillips met with Joe and Charlotte Lightsey at the Lightsey home as arranged. Joe Lightsey sent Charlotte Lightsey to monitor the radio at the sheriff's office; Phillips was sent to Surrency, Georgia, to monitor calls on the state police band; Carter was told to meet Larry Jackson at 7:30 that evening; and Joe Lightsey was going to be in the vicinity of the dairy farm in an unmarked patrol car. Later that evening, while present during the drug deliveries, Carter heard Joe Lightsey on the sheriff's band radio calling Charlotte Lightsey at the sheriff's office.

Driving Joe Lightsey's car, equipped with a police band radio, Larry Carter met Larry and Suzette Jackson at the appointed rendezvous. Carter followed the Jacksons' car to a cemetery near the dairy farm, where the Jacksons left their car and proceeded with him in Joe Lightsey's car to the dairy farm. Larry Jackson directed Carter through a dirt road connected to Thomas Morris' driveway and on to the airstrip. Lemuel Morris followed the car driven by Carter and blinked his headlights as a signal to stop when the airstrip was reached. Carter was told to park near a hay baler beside the airstrip. Two men began placing truck lights along the airstrip.

At approximately 10 p.m., the first airplane arrived. Larry Jackson told Larry Carter that the plane contained 7,000 pounds of marijuana. James Ricky Williams, assisted by others, loaded his truck with the marijuana and drove away. James Holt Griffin operated the refueling truck for the airplane. Robert Wayne Sapp and J.W. Griffin were present and assisted with this delivery.

After the unloading, Larry Jackson and Lemuel Morris talked to Larry Carter. Lemuel Morris told him that he was expecting the arrival of another airplane, and offered to pay him to stay and listen to the police band radio in Lightsey's car. Carter agreed. J.W. Griffin drove Larry and Suzette Jackson away from the airstrip; Robert Wayne Sapp and James Holt Griffin remained to assist Lemuel Morris. Another aircraft arrived. Lemuel Morris told Larry Carter that it carried 1,200 pounds of hashish. James Holt Griffin refueled the plane while Robert Wayne Sapp and others unloaded it.

Later that evening, Phillips, Larry Carter and Lightsey met at the Lightsey's house and discussed the two deliveries at the airstrip. Joe Lightsey arranged to relieve Charlotte Lightsey at the sheriff's office.

The following week Larry Carter and Phillips each received $5,000 in small bills from Joe Lightsey as payment from Larry Jackson. Concerned that Lemuel Morris had not paid up, and suggesting that they steal the drugs if he didn't, Joe Lightsey drove Larry Carter and Phillips to a house near the dairy farm known as Rigdon Place, where he said that the drugs were kept prior to distribution. Lemuel Morris did, however, pay up, and Lightsey gave Larry Carter and Phillips $1,000 each, stating that the money had come from Lemuel Morris.

### D. Act Two

In mid-September 1980, Joe Lightsey told Larry Carter and Phillips that Larry Jackson and the Morrises had a planeload of marijuana coming in that night. Lightsey stated that the marijuana belonged to "the Morrises and Larry Jackson." Larry Carter and Phillips again met with Joe Lightsey and Charlotte Lightsey at Charlotte's office in the sheriff's department. Charlotte Lightsey told them that James Carter had called and said there was going to be a party that night, which was a code message that the Morrises were also expecting a shipment. At that time, James Carter was working at the dairy farm. Lightsey again told Larry Carter and Phillips to meet him after work at his house to work out the details. At this meeting, Joe Lightsey told Larry Carter to monitor the police radio at the sheriff's office, sent Rayford Phillips to Surrency, Georgia, again, and told them that he was going to meet the Jacksons as Larry Carter had done during the previous delivery. Joe Lightsey told Larry Carter and Phillips that if they discovered any other law enforcement agencies in the county to contact James Carter at the dairy farm office.

At approximately 10 p.m. that evening, Larry Carter and Phillips received the signal from Joe Lightsey that the delivery was complete. Phillips, Larry Carter and Joe Lightsey then met at the Lightsey residence. Joe Lightsey told them that Lemuel Morris and Larry Jackson had been on the airstrip with him during the delivery, and that he had seen James Carter at the dairy farm office. Lightsey stated that Larry Jackson's plane had come in, and that the Morrises had a load delivered by a twin-engine Howard airplane whose landing gear had been damaged and grounded near the airstrip.

A few days later, alerted by Rayford Phillips that law enforcement officials were planning to fly over the airstrip and take photographs, Joe Lightsey spoke with Lemuel Morris and Larry Jackson about the downed aircraft. Larry Jackson assumed the responsibility for concealing the aircraft in the woods near the airstrip.

Three days after the second delivery, Lightsey, Larry Carter, Phillips and Larry Jackson, accompanied by Suzette Jackson, proceeded to the Winn's residence in Pierce County, Georgia, approximately a mile from the Appling and Pierce County line. Mr. and Mrs. Winn had been contacted by Larry Jackson in September of 1980 about using a shed on their property as a stash house for the marijuana prior to distribution. The Winns testified for the government at appellants' trial. While at the Winn stash house, Larry Carter aided Joe Lightsey, Larry Jackson, James Holt Griffin and another person in loading bales of marijuana into a Winnebago. James Holt Griffin drove the Winnebago. A total of two Winnebagos and three automobiles were loaded with marijuana.

Approximately a week after the second delivery, Larry Carter and Phillips received $5,000 in small bills from Joe Lightsey for Larry Jackson's shipment. Later they received $1,000 each from Joe Lightsey for Lemuel Morris.

### E. Act Three

In late October, Joe Lightsey, Larry Carter, Phillips and Larry Jackson went to the Winn's stash house. Carter aided in loading wet marijuana into a horse trailer. Larry Jackson told them that the marijuana had arrived unexpectedly in the rain, and offered to pay them for the load even though they had not assisted in the delivery. Suzette Jackson was present at the stash house during this loading. As before, when Carter and Phillips were brought to

the stash house, they observed several men involved in the marijuana loading whom they did not recognize as being from Appling County.

Later, Larry Jackson gave Larry Carter $4,000 in payment for the third load, to be divided between Carter and Phillips.

### F. Behind the Scenes

In May of 1980, William Breen, a marijuana distributor, was put in contact with Larry Jackson by his partner, George Mitchell. Breen testified for the government at appellants' trial. In May of 1980, Breen went to Baxley, Georgia, and met with Larry and Suzette Jackson to work out the details for the marijuana distribution. Larry Jackson told him that he had airstrips, a stash house, a guest house where Breen's crews could stay while awaiting deliveries and that he had a sheriff, a chief of police, a Georgia Bureau of Investigation agent, and a Drug Enforcement Administration agent working with him. Larry Jackson took Breen on a tour of the guest house, the stash house, and an airstrip. Breen declined Jackson's invitation to meet the sheriff working with Jackson.

In mid September 1980, Mitchell made arrangements for Breen to bring a crew to Baxley, Georgia. Breen met with Mitchell and Jackson at the guest house; James Holt Griffin and Ricky Williams were also present. On Larry Jackson's direction, James Holt Griffin drove Breen to a church parking lot where Breen's vehicles were to meet after taking delivery of the marijuana. Breen's crew, using two Winnebagos and three automobiles, picked up 3,300 pounds of marijuana from the stash house.

A few days later, Mitchell contacted Breen about a 5,000 pound load of marijuana to be picked up from Appling County. Breen made the arrangements for one of his associates to drive an eighteen wheeled tractor-trailer to the stash house; 5,500 pounds of marijuana were loaded onto this trailer and taken to Wisconsin.

In late October of 1981, Breen was again contacted by Mitchell to pick up marijuana in Appling County. Using the tractor-trailer Breen and his crew loaded 12,500 pounds of marijuana and took it to Michigan.

### G. Encore

In late January and early February of 1981, Larry Carter and Rayford Phillips agreed to cooperate with the FBI in its investigation of drug smuggling in Appling County. Both agreed to tape conversations with the smugglers and began wearing a tape recording device for that purpose. In February of 1981, a special grand jury for the Southern District of Georgia was convened in Savannah, Georgia, and began investigating drug smuggling activities. Numerous conversations among Larry Carter, Phillips, and other members of the drug smuggling operation were tape recorded and introduced into evidence at appellants' trial. Most of these conversations centered around detecting which members of the operation were cooperating with the grand jury in its investigation.

On February 27, 1981, Larry Carter met with Larry Jackson at his residence. In a taped conversation, Jackson and Carter tried to identify who might be cooperating with the grand jury, and Jackson offered Carter $10,000 to participate in unloading another plane.

On March 3, 1981, Larry Carter and Phillips met with Larry and Suzette Jackson at their home. In a taped conversation, they discussed the grand jury investigation and who might be involved; Suzette and Larry Jackson discussed the amounts of payoffs made by Larry Jackson and Lemuel Morris to James Carter and Joe Lightsey; and Larry Jackson stated that Suzette Jackson had learned his business well in just one year.

On March 20, 1981, Charlotte Lightsey appeared before the special grand jury in Savannah. Under oath, she denied that Larry Jackson had ever offered or paid money to Joe Lightsey or his deputies for protection, or that she had been present when Joe Lightsey discussed the drug protection business with Larry Carter and Phillips. She rode back from the trip to Savannah in a car with Larry Carter and Phillips. In a taped conversation, she stated that she

"lied like hell"[5] to the grand jury, and that she was not afraid of a perjury prosecution because prosecution for perjury was rare.

Returning to Baxley on March 20, 1981, Carter and Joe Lightsey met with James Carter. They discussed the grand jury investigation, the identity of the persons present at the August 29, 1980, delivery to ascertain who could link them to the delivery, and the relationship between Larry Jackson and Lemuel Morris. James Carter stated that Lemuel Morris had built the airstrip together with Larry Jackson.

On March 21, 1981, Larry Carter met with Larry and Suzette Jackson. In a taped conversation, they guessed that an associate of Lemuel Morris had been cooperating with the grand jury, and that he had seen Larry Carter, Larry Jackson and Suzette Jackson on the airstrip the night of the first delivery.

On April 18, 1981, Larry Carter and Phillips met with Lemuel Morris at the dairy farm. In this taped conversation, Morris expressed his fear that either James Ricky Williams or Suzette Jackson was cooperating with the authorities.

### III. THE ISSUES

We proceed to an examination of the various challenges raised by appellants to their convictions.

**A. The Admissibility of the Tape Recorded Conversations**

■ Appellants claim that the trial court committed reversible error by admitting the tape recorded conversations among Larry Carter, Phillips, and various appellants into evidence, contending that these conversa-

tions are co-conspirator hearsay statements. Under Fed.R.Evid. 801(d)(2)(E) a statement made by a co-conspirator is not hearsay if it is made in furtherance of the conspiracy and during its pendency. In this Circuit, the requirements of Rule 801(d)(2)(E) have been explicated by *United States v. James*, 590 F.2d 575 (5th Cir.1979) (en banc).[6] Under *James*, in order to admit a co-conspirator's statement, the court must determine, by a preponderance of the evidence: (1) that a conspiracy existed, (2) that the co-conspirator and the defendant against whom the co-conspirator's statement is offered were members of the conspiracy, and (3) that the statement was made during the course and in the furtherance of the conspiracy. *Id.* at 582–83. Appellants contend that the tapes were not admissible under *James* because the conspiracy had ended by the time the conversations took place and because the taped statements were not in furtherance of the conspiracy, but were mere conversation about past events. We disagree.

■ Appellants James Carter, Robert Wayne Sapp, and Joe Lightsey, in a contention adopted by other appellants, object to the admissibility of the tapes as a whole and fail to identify which tape, or statement in a particular tape, is claimed to be inadmissible.[7] In support of this contention, appellants claim that the RICO conspiracy involving drug smuggling and bribery ended prior to the taping of the conversations in 1981, and that any statements regarding past drug smuggling and bribery activities of the conspirators were not in furtherance of the conspiracy. The trial court found, however, and we agree, that the RICO conspiracy in which appellants

---

**5.** Gov.Exs. 12A & 12B.

**6.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted the case law of the former Fifth Circuit handed down as of September 30, 1981, as its governing body of precedent.

**7.** The government contends that many of the tapes are admissible on grounds other than Rule 801(d)(2)(E), such as a declaration against the declarant's penal interest under Fed.R.Evid.

804(b)(3) or an admission, and that the tapes have an evidentiary value as to the fact that certain conversations took place, that certain subject matter was discussed, and that certain appellants were known to one another in connection with the drug smuggling, apart from the truth of the matters asserted in the conversation. After a careful review of the tapes, we agree that many portions of the tapes are admissible on grounds other than Rule 801(d)(2)(E).

were members encompassed the further objective of the conspiracy to obstruct justice—this objective continued until the return of the indictment in this case.[8] In this context, statements relating to strategy in the face of the grand jury's investigation and an attempt to discover who was cooperating with the grand jury were far more than mere conversation about past events, and were clearly in furtherance of an objective of the RICO conspiracy.[9] Appellants have failed to demonstrate that the tapes as a whole were erroneously admitted.

Appellant Thomas Morris specifically challenges one statement on a tape. In the course of a conversation between Larry Carter and James Ricky Williams on April 16, 1981, concerning the fact that someone had been talking to the grand jury and that in order to identify the conspirators that person must have been present at the August 26, 1980, delivery, Williams stated, "Tom and them might be trying to get out of trouble or Lemuel and them."[10] We find that this statement was made in the context of furthering an objective of the ongoing RICO conspiracy, obstruction of justice, and was thus properly admissible

under Rule 801(d)(2)(E) against Thomas Morris, a RICO conspirator.

**B. The RICO Conspiracy Challenges**

Eight appellants were charged and convicted under Count One of the indictment with conspiracy to violate RICO.[11] Appellants challenge their RICO conspiracy convictions on various grounds. We consider each of their contentions and, for the following reasons, affirm their RICO conspiracy convictions.

*1. The Government's Proof of a Nexus Between the Enterprise and the Racketeering Activity*

The appellants' first attack upon the validity of their RICO conspiracy convictions concerns the government's proof that the enterprise conducted its affairs "through" a pattern of racketeering activity as required by 18 U.S.C.A. § 1962(c).[12] In this case, the government elected to cast the enterprise for RICO purposes in the form of the legitimate business, Morris Dairy Farms, Inc., wholly owned by Lemuel and Thomas Morris.[13] The government's proof of connections between the racketeering activity, drug smuggling and bribery, and the dairy farm was that: (1) a pasture located on the

---

**8.** The original indictment alleged that one of the predicate acts contemplated by the RICO conspiracy was the obstruction of justice. The redacted version of the indictment omitted this reference. That omission does not defeat the government's claim that there was an ongoing conspiracy. Independent evidence of the objective of the RICO conspiracy to obstruct justice was present in this case, including those portions of the tapes admissible on grounds other than Rule 801(d)(2)(E). *Cf. United States v. Peacock,* 654 F.2d 339, 349 (5th Cir.1981).

Further, we note the presence of independent evidence that the drug smuggling and bribery objectives of the conspiracy continued beyond the date of the last substantive charge in the indictment, October, 1980. Gov. Exs. 10A & 10B.

**9.** Without specifying which portions of the tapes are being challenged, appellants claim that the tapes contain statements not in furtherance of the conspiracy to obstruct justice. It is impossible to review this contention without specific statements and the context in which they arose being identified. We note, however, the government's argument that in the event statements on the tapes were improp-

erly admitted as not in furtherance of the conspiracy to obstruct justice, in light of the overwhelming evidence of appellants' guilt apart from the tapes, the error was harmless.

**10.** Gov.Exs. 16A & 16B.

**11.** Lemuel Morris, Thomas Morris, Larry Jackson, Suzette Jackson, Joe Lightsey, Charlotte Lightsey, James Carter and Robert Wayne Sapp.

**12.** Appellant Joe Lightsey claims that the government failed to prove that the enterprise charged, Morris Brothers Dairy Farms, Inc., engaged in interstate commerce as required by 18 U.S.C.A. § 1962(c). This claim is contradicted by the record. The dairy farm's bookkeeper testified that the dairy farm engaged in out-of-state business. 19 R. 5–6.

**13.** *Cf. United States v. Cagnina,* 697 F.2d 915 (11th Cir.1983) (enterprise can include informal criminal network engaged in racketeering activity); *United States v. Martino,* 648 F.2d 367 (5th Cir.1981) (RICO applicable to group whose sole purpose is to engage in criminal activities).

dairy farm was the site on which an airstrip was constructed and utilized for bringing in shipments of drugs; (2) the dairy farm office was used for communication between conspirators concerning protection of the drug smuggling activities from law enforcement authorities; (3) workers of the dairy farm participated in the drug smuggling and protection activities; and (4) a house on the dairy farm property was used for storing the drugs prior to distribution. In short, the evidence revealed that the facilities and employees of the dairy farm were utilized in furtherance of the drug smuggling and bribery venture.

Appellants rely on *United States v. Hartley,* 678 F.2d 961 (11th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 815, 74 L.Ed.2d 1014 (1983), as establishing the standard for the sufficiency of the required nexus between the affairs of the enterprise and the racketeering activity. In *Hartley,* this Court held that the government met its burden of proving conduct "through" a pattern of racketeering activity since there was "[a] sufficient nexus between the deceptive affairs employed by the defendants in the inspection of breaded shrimp and the common everyday affairs of the enterprise—the production of breaded shrimp." *Id.* at 991. Appellants seize upon this language in *Hartley* as setting forth the minimal nexus required between an enterprise and the racketeering activity to support a RICO conviction. Appellants' reliance on *Hartley* is misplaced.

*Hartley* does not support the imposition of a requirement that in all RICO prosecutions the government can meet its burden of proving conduct "through" a pattern of racketeering activity *only* by proof of a relationship between the enterprise and the illegal activity affecting the common everyday affairs of the enterprise. The *Hartley* court did not so hold; instead, the *Hartley* court applied the standard articulated in

*United States v. Welch,* 656 F.2d 1039 (5th Cir.1981), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1768, 72 L.Ed.2d 173 (1982), requiring a relation between the affairs of the enterprise and the racketeering activity and holding that "by the use of the word 'through,' Congress intended *only* to require a sufficient nexus between the racketeering activities and the affairs of the enterprise." *Hartley,* 678 F.2d at 991 (quoting *Welch,* 656 F.2d at 1062) (emphasis supplied by the *Hartley* court).

In *Welch,* the former Fifth Circuit delineated the principles governing the required nexus between the enterprise and the pattern of racketeering activity. As in both *Hartley* and the present case, the defendant in *Welch* relied on the original panel opinion in *United States v. Webster,* 639 F.2d 174 (4th Cir.), *cert. denied,* 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981), in support of the claim that conduct of an enterprise's affairs "through" a pattern of racketeering activity requires that the affairs of the enterprise be promoted or advanced by the racketeering activities.[14]

In *Webster,* the enterprise alleged was the 1508 Club and Tavern Liquor Store, used to facilitate a pattern of racketeering activity involved in the drug distribution operations of the Club's owner. No proof was offered by the government that the drug distribution business in any way promoted or advanced the operations of the Club. The government argued that "the statute [18 U.S.C.A. § 1962(c)] requires only a substantial nexus between the racketeering and the conduct of the enterprise's affairs, regardless of which direction the assistance flows." *Id.* at 184. The *Webster* court initially rejected this argument and, in language relied on by appellants, held that:

> The meaning of the word "through" suggests that, at least where the government elects to cast a § 1962(c) indictment in a

---

14. Appellants also rely on *United States v. Nerone,* 563 F.2d 836, 850–52 (7th Cir.1977), *cert. denied,* 435 U.S. 951, 98 S.Ct. 1577, 55 L.Ed.2d 801 (1978), and *United States v. Mandel,* 591 F.2d 1347, 1376 (4th Cir.1979). As in *Welch,* we find the conclusion of the court in *United*

States v. Bright, 630 F.2d 804 (5th Cir.1980), equally applicable here: "[T]his case is distinguishable from those where the pattern of racketeering activity alleged was not linked to the alleged enterprise's affairs." 656 F.2d at 1062 (quoting *Bright,* 630 F.2d at 830–31).

form in which the "enterprise" is the legal or ostensibly legal activity, ... the statute should be applied in such a way as to punish where the racketeering activity advances the nonracketeering business, but not where the only relation between the two consists of benefits which the racketeering activity derives from the nonracketeering activity.

Id. at 184–85.

The court in Welch, however, disagreed with the Webster court's interpretation of Section 1962(c), finding this analysis to be "unduly restrictive." 656 F.2d at 1061. Instead, the Welch court held that the government is only required to prove "a relation between the predicate offenses and the affairs of the enterprise." Id. The Welch court found that "[i]n view of the link between the enterprise—which makes possible the racketeering activity—and the racketeering activity itself, it cannot convincingly be said that the enterprise is not being conducted through a pattern of racketeering activity." Id. (emphasis supplied).[15]

▮▮▮ The link between the enterprise and the racketeering activity present in Welch is precisely what was shown by the government's evidence in this case: the enterprise, the dairy farm, made possible or facilitated the racketeering activities through use of the dairy farm land as an airstrip and a stash house for the drugs, the use of dairy farm employees in the drug smuggling, and the use of the dairy farm office for the drug smuggling and protection activities. Therefore, we hold that, although clearly sufficient to support the required nexus between the enterprise and the racketeering activity, proof of an effect upon the common, everyday affairs of the enterprise is not the minimum required to establish a relation between the enterprise and the racketeering activity, and that proof that the facilities and services of the enterprise were regularly and repeatedly utilized to make possible the racketeering activity also establishes the conduct of the affairs of the enterprise "through" a pattern of racketeering activity.[16] To hold otherwise would frustrate the major thrust of RICO, repeated time and time again in its legislative history, as a weapon fashioned by Congress to combat the infiltration of legitimate businesses by organized crime. United States v. Turkette, 452 U.S. 576, 591, 101 S.Ct. 2524, 2532–33, 69 L.Ed.2d 246 (1981). Such an infiltration of a legitimate business does not have to reach the level on which the everyday affairs of the business are affected before RICO is triggered. "We do not believe that by the use of the word 'through,' Congress intended to create additional limitations on the use of RICO to eradicate the infiltration of legitimate busi-

---

**15.** In a like vein, subsequent to Welch, the original panel opinion in Webster was modified on rehearing, and the Fourth Circuit withdrew its earlier interpretation of Section 1962(c). United States v. Webster, 669 F.2d 185 (4th Cir.1982). Affirming defendants' convictions, the Webster court on rehearing reviewed the government's evidence that the affairs of the 1508 Club were conducted through a pattern of racketeering activity:

> Evidence introduced at the trial tended to show that, by means of the telephone company's call-forwarding service, telephone calls to Webster's and Thompson's home telephone ... were frequently forwarded to the telephone at the 1508 Club; [and] that Club facilities and personnel were used to accept and relay narcotics related messages...
> . . . .
> The evidence which the government has offered as sustaining the convictions under subsection (c) indicates that the facilities of the 1508 Club were regularly made available

to, and put in the service of, the defendants' drug dealing business. Id. at 187.

This evidence was held sufficient to establish the nexus between the racketeering activities and the enterprise.

**16.** In United States v. Cauble, 706 F.2d 1322 (5th Cir.1983), the Fifth Circuit formulated a test for determining the sufficiency of the government's proof of the required nexus between the enterprise, the defendant, and the pattern of racketeering activity. As we find the nexus established in the present case clearly sufficient under Welch and Hartley, we do not reach the issue of the appropriate test in this Circuit for such a determination. We note, however, that under the Cauble test the evidence in this case is sufficient to establish the requisite nexus between the enterprise and the racketeering activity; "[t]he prosecution need only prove that the racketeering acts affected the enterprise in some fashion." Id. at 1333 n. 24.

nesses by organized crime." *Welch,* 656 F.2d at 1061 n. 29.

### 2. The Jury Instructions: Requirements of An Agreement to Violate RICO [17]

■ Appellants' second attack on the validity of their RICO convictions focuses on the contents of an agreement to violate RICO. A RICO conspiracy requires proof of an agreement to violate a substantive RICO provision, in this case 18 U.S.C.A. § 1962(c). *United States v. Phillips,* 664 F.2d 971, 1011–12 (5th Cir. Unit B 1981); [18] *United States v. Elliott,* 571 F.2d 880, 902 (5th Cir.), *cert. denied,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978). Appellants contend that an essential element of an agreement to violate RICO is that the defendant must agree to personally commit two predicate acts,[19] and that the trial court erred in declining to so instruct the jury. The charge given by the trial court advised the jury of the elements of a substantive RICO offense. The court then instructed the jury on the *general law of conspiracy as applica-ble to a* RICO conspiracy.[20]

■ The issue thus presented is whether RICO alters *general principles of federal* conspiracy law to require that the defendant must agree to personally commit two predicate acts, or whether consonant with federal conspiracy law a RICO conspiracy agreement consists of a defendant agreeing to participate in the conduct of an enterprises's affairs with the knowledge and intent that two predicate acts be committed.[21]

---

17. Appellants also contend that the trial court erred in declining to instruct the jury that proof of the conduct of the affairs of an enterprise "through" a pattern of racketeering activity required proof of an effect on the common everyday affairs of the enterprise. Since we find that this is not the required standard, refusal to give such an instruction was not error.

Appellant Thomas Morris claims that the trial court erred in failing to instruct the jury that, in order to establish a conspiracy under general conspiracy law, the government was required to prove knowledge of the conspiracy, actual participation and criminal intent beyond a reasonable doubt. A review of the record reveals that the conspiracy charge given adequately set forth the elements of general conspiracy law, including knowledge, participation and criminal intent.

18. In *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33, 34 (11th Cir.1982), this Court adopted as binding precedent the post-September 30, 1981, *decisions of the Unit B panel of the for-mer* Fifth Circuit.

19. Predicate acts or crimes are those acts defined in § 1961(1) and (5) as establishing a pattern of racketeering activity. In this case, the predicate acts charged were drug smuggling and bribery.

20. The trial court's instructions:
What the evidence in the case must show beyond a reasonable doubt is:
(1) That two or more persons in some way or manner, positively or tacitly, came to a mutual understanding to try to accomplish a common and unlawful plan, as charged in the indictment;
(2) That the Defendant in question willfully became a member of such conspiracy;
(3) That one of the conspirators, during the existence of the conspiracy, knowingly committed at least one of the means or methods (overt acts) described in the indictment; and
(4) That such overt act was knowingly committed at or about the time alleged in an effort to accomplish or effect some object or purpose of the conspiracy.
19 R. 85.
We note that this charge actually gave appellants the benefit of a requirement that an overt act in furtherance of the conspiracy be proved by the government. In *United States v. Coia,* 719 F.2d 1120 at 1123–1125 (11th Cir.1983), this Court held that unlike the general federal conspiracy statute, 18 U.S.C.A. § 371, the RICO conspiracy statute does not require proof of an overt act in furtherance of the conspiracy. We further note the government's argument that, because a RICO conspiracy does not require proof of an overt act in furtherance of the conspiracy, there is no basis for requiring that a RICO conspiracy agreement contemplate that the defendant will himself commit two predicate acts. We find, however, that the overt act requirement and the elements of an agreement to violate RICO are conceptually distinct, and that it is possible that the agreement criminalized by RICO consists of a defendant's agreement to personally commit two predicate acts without requiring any acts in furtherance of this agreement.

21. Under the general federal conspiracy statute, 18 U.S.C.A. § 371, a defendant need only agree to participate in the conspiracy with knowledge of the essential objectives of the conspiracy. *See United States v. Ballard,* 663 F.2d 534, 543 (5th Cir. Unit B 1981).

In order to resolve this issue, we need only to review the statute, the effect of RICO on general federal conspiracy law, and the previous decisions of this Court.

Section 1962(c) sets forth the substantive RICO offense in this case: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." A pattern of racketeering activity is defined in Section 1961(5) as at least two acts of racketeering activity within ten years of each other, with racketeering activity defined in Section 1961(1) to include various state and federal offenses. Section 1962(d) provides that "It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b) or (c) of this section." When read together, the statutes speak only to "conspiring to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity, *i.e.,* two acts of racketeering activity within at least ten years of each other." The statutory language itself imposes no requirement that the defendant must agree to participate in the conduct of an enterprise's affairs only by personally committing two predicate acts.[22] Further we note that "in enacting RICO, Congress found that 'organized crime continues to grow' in part 'because the sanctions and remedies available to the Government are unnecessarily limited in scope and import.'" *United States v. Elliott,* 571 F.2d 880, 902 (5th Cir.1978). Imposing a requirement that in all cases the government must prove that each defendant agreed to personally commit two predicate acts would severely limit the RICO conspiracy remedy provided by Congress.

In the seminal RICO decision of *United States v. Elliott,* this Court found that, in passing RICO, "Congress acted against the backdrop of hornbook conspiracy law," 571 F.2d at 902, and thus that in order to find a RICO conspiracy agreement an overall objective was necessary. The innovation of Congress in RICO was in "defin[ing] that objective through the substantive provisions of the Act." *Id.* at 903.

> Thus, the object of a RICO conspiracy is to violate a substantive RICO provision—here, to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity—and not merely to commit each of the predicate crimes necessary to demonstrate a pattern of racketeering activity.

*Id.* at 902.

The content of the agreement criminalized by RICO is still defined against the backdrop of general conspiracy law, with the caveat of the RICO definition of the objective contemplated by that agreement. The *Elliott* court did not reject general federal conspiracy law as applicable to a RICO conspiracy agreement.[23]

Appellants claim that in our previous decisions this Court has required that a RICO conspiracy contain an agreement by a defendant to personally commit two predicate acts. In *Elliott* the court stated:

> To be convicted as a member of an enterprise conspiracy, an individual, by his words or actions, must have objectively manifested an agreement to participate, directly or indirectly, in the affairs of an

---

**22.** The natural reading of this language is that "through a pattern of racketeering activity" modifies the preceding language "the conduct of such enterprise's affairs," rather than, as appellants urge, "conspiring to conduct or participate."

**23.** In relation to general conspiracy law concepts, the *Elliott* court stated that Congress intended to replace the "wheel" and "chain" concepts of traditional conspiracy law with a new statutory concept, the enterprise. 571

F.2d at 902. This language was explicated by the court in *United States v. Sutherland,* 656 F.2d 1181, 1192 n. 7 (5th Cir.1981): "In context, . . . this language suggests not that Congress in RICO sought to change traditional conspiracy concepts, but that Congress instead sought to expand the reach of traditional conspiracy charges by establishing a new substantive crime around which a conspiracy might center."

enterprise *through the commission of two or more predicate crimes.*

571 F.2d at 903 (emphasis in original). Each defendant in *Elliott* had actually committed two or more predicate crimes, and, to the extent this language is claimed to apply outside this context, it is dicta. Certainly, where the evidence reveals that a defendant committed two predicate acts, "the inference of an agreement to do so is unmistakable." *Id.* Finally, we note the *Elliott* court's emphasis upon agreeing to participate in the enterprise, rather than agreeing to commit each of the predicate acts through which the affairs of the enterprise were conducted, as the proper focus of the inquiry:

> [Defendant Foster] may have been unaware that others who had agreed to participate in the enterprise's affairs did so by selling drugs and murdering a key witness. That, however, is irrelevant to his own liability, for he is charged with agreeing *to participate* in the enterprise through his own crimes, not with agreeing *to commit* each of the crimes through which the overall affairs of the enterprise were conducted.

*Id.* at 904 (emphasis in original) (footnote omitted).

The cases following *Elliott* on which appellants rely have one feature in common: the agreement into which the defendant entered did not contemplate the commission of the two predicate acts necessary to constitute a pattern of racketeering activity, and thus was not a RICO conspiracy agreement. In *United States v. Phillips,* 664 F.2d 971 (5th Cir. Unit B 1981), the court reversed defendant Echezarreta's RICO conspiracy conviction:

> [W]e find that [Echezarreta] could be guilty of participating in a RICO conspiracy, even though the conspiracy had the single objective of importing the 200 pound load of marijuana, so long as he committed or agreed to commit at least

two separate crimes in furtherance of the conspiracy's single objective.

> . . . .

> [U]nless there occurred two separate acts which Echezarrata agreed to do in furtherance of the conspiracy to import marijuana, there was no pattern of racketeering activity necessary for conviction for participation in a RICO conspiracy.

*Id.* at 1039.

The theme of *Elliott* is echoed: in RICO, Congress expanded traditional conspiracy law by creating a new objective for a RICO conspiracy, violation of a substantive RICO provision. When an agreement lacks this essential element, no pattern of racketeering activity necessary for a RICO conspiracy is present unless the defendant supplies the lack by personally agreeing to engage in a pattern of racketeering activity in furtherance of the conspiracy's single objective. It does not follow, however, that when the agreement contemplates the objective of a RICO substantive violation, and a pattern of racketeering activity is therefore present, a defendant must agree to personally commit each of the predicate acts necessary for a pattern of racketeering activity.

*United States v. Martino,* 648 F.2d 367 (5th Cir.1981), further illustrates this distinction. Defendant Chase's agreement contemplated the single objective of the commission of arson. No pattern of racketeering activity was agreed to by defendant Chase.[24] The court found that, in these circumstances, "in effect there are two agreements contained in a RICO conspiracy charge: an agreement to participate and an agreement to commit at least two proscribed acts." *Id.* at 396. As in *Phillips,* when a defendant's agreement does not include the objective of a RICO conspiracy, he must further agree to personally commit two predicate acts in order for RICO to apply. However, when a *defendant agrees* to become a member of a conspiracy with the essential RICO objective, further proof

---

**24.** Likewise, defendant Lostracco's RICO conspiracy conviction was reversed by the *Martino* court. 648 F.2d at 400. Lostracco agreed to participate in a conspiracy with the single objective of committing arson. "The mail fraud which was a part of that plan . . . [was] not the mail fraud charged in the indictment." *Id.*

that the defendant agreed to *personally* commit two predicate acts is not necessary.

In summary, we hold that where the government's evidence establishes that a defendant agreed to participate in a conspiracy with a single objective, the requisite pattern of racketeering necessary to the objective of a RICO conspiracy is lacking. Only by demonstrating that the defendant agreed to personally commit two or more predicate acts is this lack cured. In a case of this type, the trial court must instruct the jury that an essential element of a RICO conspiracy charge is an agreement to participate in the enterprise's affairs by personally committing, or agreeing to personally commit, two or more predicate acts.[25] When, however, as in the present case, a defendant agreed to participate in the conduct of an enterprise's affairs with the objective of violating a substantive RICO provision, it is not necessary that the defendant agree to personally commit two predicate acts for the required pattern of racketeering activity. It is enough that the defendant agreed to the commission of two predicate acts. An instruction on the objectives of a RICO conspiracy followed by an instruction on general federal conspiracy law is sufficient. In this case, the enterprise charged and proved was a group of people who shared the common goals of drug smuggling and bribery of law enforcement officials for protection of their illegal activities, and who worked together to achieve those goals. Certainly every member of the group was not involved in every transaction, but every transaction was part of the conduct of the affairs of the enterprise to which every member belonged. The trial court did not err in refusing to instruct the jury that an agreement to personally commit two or more predicate acts was required in order to convict a defendant of a RICO conspiracy.

*3. A Material Variance: Proof of Multiple Conspiracies When A Single Conspiracy Was Charged?*

■ Appellants Larry and Suzette Jackson, in a contention adopted by other appellants, claim that a material variance between the indictment charging a single RICO conspiracy and the government's proof of multiple conspiracies affected their substantial rights. They rely on *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), and *United States v. Sutherland,* 656 F.2d 1181 (5th. Cir.1981). These cases are distinguishable from the present case: in *Kotteakos* and *Sutherland* the government failed to offer *any* proof of a single conspiracy. The *Sutherland* court explained the significance of this distinction:

> If the government sufficiently supports its charge of a single conspiracy, evidence at trial of multiple conspiracies does not of itself create a material variance with the indictment; at most, such evidence creates a fact question and entitles the defendants to a jury instruction on the possibility of multiple conspiracies.

656 F.2d at 1189 n. 5.

The trial court in this case instructed the jury that a single conspiracy must be found in order to convict the appellants of a RICO conspiracy. Evidence of a single conspiracy was also present: although both Larry Jackson and Lemuel Morris each had his own deliveries, pilots and stash houses, they both also used the same airstrip, the same personnel to assist in offloading, and the same law enforcement officials for protection. From this evidence a reasonable jury could infer a common objective and a single conspiracy. *See United States v. Hawkins,* 661 F.2d 436, 457 (5th Cir. Unit B 1981).

## C. The Sufficiency of the Evidence

■ Appellants challenge the sufficiency of the evidence to support their convictions on both the RICO conspiracy count and the substantive counts of possession of marijuana with intent to distribute, aiding and abetting possession of marijuana with intent to distribute, and perjury before a grand jury. Reviewing a conviction for sufficiency of the evidence requires this

**25.** *See United States v. Lee,* 622 F.2d 787, 791 (5th Cir.1980).

Court to view the evidence, including all inferences that may be reasonably drawn from it, in the light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). "It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided that a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Bell,* 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc). We review the counts in the indictment sequentially.

### 1. Count One: RICO Conspiracy

#### A. Suzette Jackson

 Suzette Jackson challenges the sufficiency of the evidence to convict her of a RICO conspiracy. The evidence demonstrated that she was present at the August 29, 1980, delivery and other critical meetings, and that she admitted that she kept records of the income and expenses related to the drug smuggling and bribery activities. We also note that she was convicted of two substantive counts involving possession of marijuana with intent to distribute. There was sufficient evidence to convict her of the RICO conspiracy.

#### B. Thomas Morris

 Thomas Morris was convicted of the RICO conspiracy on the basis of circumstantial evidence.[26] This is not fatal to the government's case; "direct evidence of agreement is unnecessary: proof of such an agreement may rest upon inferences drawn from relevant and competent circumstantial evidence." *United States v. Elliott,* 571 F.2d 880, 903 (5th Cir.1978). The circumstantial evidence in this case consisted of evidence that Thomas Morris was the co-owner and active manager of the dairy farm, and as such was present at the dairy farm during and after working hours and was the individual most familiar with the operations of the dairy farm; that Thomas

Morris was aware of the airstrip and offered its use to a crop duster in 1980; that Thomas Morris was aware of the presence of a camouflaged airplane next to the airstrip; that Thomas Morris' driveway was located on the route to the airstrip; that a tape recorded conversation between Larry Carter and James Ricky Williams contained a statement that "Tom and them might be trying to get out of trouble or Lemuel and them;" and that numerous statements were made by the conspirators that the Morrises were expecting or had received deliveries of drugs. Based on this evidence, and the inferences properly drawn from it, we cannot say that a reasonable jury could not have found beyond a reasonable doubt that Thomas Morris was a member of the RICO conspiracy.

### 2. Count Two: Possession of Marijuana and Hashish with Intent to Distribute

Count Two charged the possession of 6,500 pounds of marijuana and 1,200 pounds of hashish, in violation of 21 U.S.C.A. § 841(a)(1), and aiding and abetting the possession of these substances, in violation of 18 U.S.C.A. § 2, involved in the August 29, 1980, deliveries of two planeloads of drugs.

#### A. Lemuel Morris, Larry Jackson, and Suzette Jackson

 These appellants advance opposite sides of the same argument: Larry and Suzette Jackson argue that a material variance exists between the indictment charging possession of both marijuana and hashish and the government's proof that they left the airstrip before the hashish arrived; Lemuel Morris claims that there was insufficient evidence to convict him of possession of marijuana because he was not shown to have taken custody of the marijuana. Each claim is without merit. The multiple connections between the Jacksons and Lemuel Morris on the night of the delivery established by the government's proof were a sufficient basis for the jury to infer that all three were involved in both shipments. All

---

**26.** The government's principal witness, Larry Carter, could not identify Thomas Morris.

three met prior to proceeding to the airstrip that night, the Jacksons followed Morris to the airstrip, and all three were present prior to the arrival of the first shipment. Further, since Lemuel Morris provided the airstrip, it is evident that he aided and abetted the possession of the marijuana even if he did not personally take custody. In any event, even assuming a variance between the indictment and the proof as to possession of both marijuana and hashish for these appellants, the further inquiry is whether such variance affected appellant's substantial rights. They were not taken by surprise and prevented from presenting a proper defense. Nor have they argued why they could not successfully plead double jeopardy against reprosecution. *See United States v. Sheikh,* 654 F.2d 1057, 1066–67 (5th Cir.1981).

**B. Joe Lightsey, Charlotte Lightsey, and J.W. Griffin**

■ The government's theory as to each of these appellants [27] was that they aided and abetted the illegal possession. In order to be convicted of aiding and abetting, a defendant must associate himself with the venture, participate in it as something he wishes to bring about, and seek by his action to make it successful. *United States v. Houde,* 596 F.2d 696, 703 (5th Cir.1979). There was sufficient evidence for a reasonable jury to convict each of these appellants.

The evidence revealed that the fuel used to refuel the airplanes was stored on J.W. Griffin's property; that he owned the truck that was used to refuel both planes; that he was present on the airstrip on the night of the deliveries; and that he drove Larry and Suzette Jackson away from the airstrip. Because J.W. Griffin failed to move for a judgment of acquittal at the conclu-

sion of the evidence, we find that on this record affirmance of his conviction on Count Two is not a miscarriage of justice. *United States v. Raffo,* 587 F.2d 199, 200 (5th Cir.1979).

As to Joe Lightsey, the evidence revealed that, although not actually present during the deliveries, he directed and participated in the protection activities, arranged for his wife to monitor the police radio at the sheriff's office, and transferred the protection payments to the other officers. A reasonable jury could infer that Joe Lightsey aided and abetted the August 29, 1980 shipments.

■ Larry Carter testified that Charlotte Lightsey was directed to relieve the regular radio operator at the sheriff's office and that he heard her voice on the sheriff's band radio while present during the August 29, 1980 deliveries. Rayford Phillips corroborated this testimony. Charlotte Lightsey's contention that her conviction should be reversed because this evidence is circumstantial is without merit. Possession, as well as aiding and abetting possession, may be established by circumstantial as well as direct evidence. *See United States v. Garza,* 531 F.2d 309, 311 (5th Cir.1976).

**3. Count Three: Possession of Marijuana with Intent to Distribute**

■ Count Three charged possession, and aiding and abetting the possession, of 5,000 pounds of marijuana involving a shipment in late September 1980. We find the evidence sufficient to sustain appellants' convictions on this count.

**A. Larry Jackson and Suzette Jackson**

These appellants claim that there was insufficient evidence of the amount of marijuana charged. However, the testimony of the distributor, William Breen, that his

---

**27.** Suzette Jackson argues that there was insufficient evidence to convict her of Count Two. She claims that the evidence shows that she was a mere bystander during the delivery. This claim is contradicted by the record. The evidence of her participation in the deliveries involved more than her mere presence at the airstrip; she stayed with Larry Carter in the

car and pointed out the activity on the airstrip; she kept the books for Larry Jackson; and the jury could properly have inferred she was interested in the arrival of the marijuana and its quantity. The evidence was sufficient to convict Suzette Jackson of aiding and abetting the possession of the illegal drugs.

crew removed 3,300 and 5,500 pounds of marijuana in late September 1980, together with the fact that the bribes paid to the law enforcement officials were equivalent to those paid for the larger August 29, 1980 delivery, and the size of the vehicles required to move the marijuana, sufficiently established the amount.

Suzette Jackson claims there was insufficient evidence to establish her guilt on Count Two. The evidence showed that she was present at the late September 1980 delivery; that she went with Larry Jackson, Joe Lightsey, Larry Carter and Rayford Phillips to the stash house where the marijuana was stored; and that she was present during the loading of the marijuana for distribution. This evidence is sufficient to support the jury's finding on Count Two.

### B. Lemuel Morris and Joe Lightsey

Lemuel Morris' claim that the evidence was insufficient to convict him is without merit. Carter and Phillips were both told that a planeload belonging to the Morrises had come in, and Morris allowed the Jackson plane to land on the airstrip.

There was also sufficient evidence to convict Joe Lightsey. His role in this delivery was essentially the same as in the August 29, 1980 delivery, with the addition that he was present at the airstrip when the planes came in and participated in the transfer of the September delivery for distribution.

### 4. Count Four: Possession of Marijuana with Intent to Distribute

Count Four charged possession, and aiding and abetting the possession, of 12,500 pounds of marijuana involved in the late October 1980 shipment. Only Larry Jackson and Lemuel Morris were convicted on this count.

Larry Jackson argues that there was insufficient evidence to support the identification or amount of marijuana. His contention that the bales contained a worthless substance is meritless in light of the payment of bribes to Larry Carter and Phillips for this load, and the removal of this load by Breen. Further, the uncontradicted testimony of Breen as to the 12,500 pounds amount, coupled with the fact that an eighteen wheeled tractor-trailer was necessary to transport the marijuana, is sufficient to establish the amount.

Larry Jackson stated that he used the dairy farm airstrip to bring in three shipments of marijuana. Viewed in the light most favorable to the government, the evidence of Lemuel Morris' provision of the airstrip for the deliveries is sufficient to convict him of aiding and abetting in the possession of the marijuana.

### 5. Count Five: Perjury Before a Grand Jury

Charlotte Lightsey was the only appellant charged and convicted on Count Five. Her sole challenge to this conviction is that the statements she made concerning the protection activities [28] were not material

---

**28.** Lightsey's testimony before the grand jury follows:

Question: Are you aware of any contacts that Larry Jackson had with your husband concerning or offering him money for protection for Larry Jackson's drug business?

Answer: I'm not aware of it, if he had any.

Question: Are you aware of any involvement between Larry Jackson and any of the deputies that worked for your husband while he was Sheriff?

Answer: No. You know, just talk, what I heard, I don't know anything really.

. . . .

Question: Have you ever been present, say when Railford [sic] Phillips talked to your husband or talked to anyone about giving protec-

tion to assist in the drug business in that county?

Answer: No, sir.

. . . .

Question: How about Larry Carter, have you ever been present where you heard conversations taking place where he was involved either in the smuggling or drug business or offering to give protection to anyone?

Answer: No, sir. My office was separate from their's.

. . . .

Question: Did you ever hear of any airplane landing about that time in August of 1980?

Answer: No. I really didn't hear that much about any of this until Joe was out of office and then, you know, you hear all kinds of stuff then.

to the grand jury's investigation of drug smuggling and bribery as required by 18 U.S.C.A. § 1623. In support of this contention, Lightsey claims that the government did not prove that her statements actually influenced the grand jury because a complete transcript of the grand jury proceedings and testimony of the grand jurors was not introduced at trial. The government is not required to prove that her statements actually influenced the grand jury; the determinative inquiry for materiality is "whether the false testimony was *capable* of influencing the tribunal on the issue before it." *United States v. Cosby,* 601 F.2d 754, 756 n. 2 (5th Cir.1979) (emphasis supplied). Further, although the methods suggested by Lightsey may be the best means of proving materiality, they are not the exclusive means of establishing materiality. *United States v. Thompson,* 637 F.2d 267, 268–69 (5th Cir.1981). In this case, Lightsey's trial for perjury also involved the trial of charges of drug smuggling and bribery investigated by the grand jury. At this trial, numerous tape recorded conversations were introduced discussing the scope of the grand jury's investigation. On these facts, the introduction of a partial transcript of the grand jury proceedings consisting only of Lightsey's testimony was sufficient to support the trial court's determination [29] that Charlotte Lightsey's testimony that her husband had not received any protection money and that she had not assisted any protection efforts was material to the grand jury's investigation of the drug smuggling and bribery operation in Appling County, Georgia.

## D. Cumulative Sentences for RICO Conspiracy and Possession of Marijuana with Intent to Distribute [30]

Appellants Joe Lightsey, Larry Jackson, and Suzette Jackson claim that the imposition of cumulative sentences for the RICO conspiracy counts and the substantive counts of possession of marijuana with intent to distribute violated the Double Jeopardy Clause or rendered the indictment multiplicious. Similar claims have been analyzed in detail and rejected by the former Fifth Circuit. *United States v. Welch,* 656 F.2d 1039, 1054 n. 21 (5th Cir.1981) (substantive RICO offenses and conspiracy charges in same indictment not multipli-

. . . .

Question: To your knowledge, did Larry Jackson ever give or offer to give large sums of money to your husband?

Answer: Not to my knowledge.

Question: When I say 'give', I mean for protection or promises made to help him in the drug business.

Answer: Not to my knowledge.

Gov.Ex. 100B.

29. The question of materiality is a legal determination to be made by the trial court. *United States v. Forrest,* 623 F.2d 1107, 1113 (5th Cir.1980).

30. Appellants Joe Lightsey, Larry Jackson, Suzette Jackson and Lemuel Morris also challenge the propriety of the sentences and fines imposed under substantive Counts Two, Three and Four. Appellants allege that the government failed to prove that more than 1,000 pounds of marijuana were involved in these counts as required by 21 U.S.C.A. § 841(b)(6). The evidence of quantity on Counts Three and Four has previously been discussed in connection with appellants' challenges to the sufficiency of the evidence and will not be repeated here. This evidence is sufficient to establish that more than 1,000 pounds of marijuana were involved for purposes of 21 U.S.C.A. 841(b)(6). The evidence of quantity on Count Two was Larry Jackson's statement on the night of the August 29, 1980 delivery that he had received 7,000 pounds of marijuana. Larry Jackson's claim that this statement is insufficient because it is uncorroborated is without merit. Suzette Jackson and Joe Lightsey claim that the admission of Jackson's statement as to quantity against them violated their confrontation rights under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). However, we find that this statement was properly admissible against appellants under the co-conspirator hearsay exception, and thus did not violate the precepts established in *Bruton. United States v. Warren,* 578 F.2d 1058, 1075 (5th Cir.1978). Lemuel Morris argues that the evidence did not show his possession of the 6,500 pounds of marijuana charged in Count Two, but only possession of 700 pounds of hashish. Leaving aside the fact that Morris told Larry Carter that he had received 1,200 pounds of hashish, as charged in the indictment, on the evening of August 29, 1980, we have previously found other evidence sufficient to support Morris' conviction of possession of the marijuana.

cious); *United States v. Martino,* 648 F.2d 367, 382–83 (5th Cir.1981) (RICO conspiracy count and RICO substantive offense count not violative of Double Jeopardy Clause.). The rationale of these decisions applies to the present case: *"[e]ach provision requires proof of a fact which the other does not." United States v. Hartley,* 678 F.2d at 991 (*quoting Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed.2d 306 (1980)) (emphasis in original). Clearly, a RICO conspiracy charge requires proof of elements, including an enterprise and an agreement, not required for proof of possession of marijuana with intent to distribute. Additionally, the offense of possession of marijuana with intent to distribute requires proof of either actual or constructive possession; an element not required for the RICO conspiracy offense. *Cf. United States v. Hartley,* 678 F.2d at 991, 992 (predicate offenses failed to possess additional element from substantive RICO provision, section 1962(c)).

 Appellant Larry Jackson contends that the imposition of an enhanced sentence under both the RICO conspiracy charge and the substantive charge of possession of marijuana with intent to distribute violates the rule of *Busic v. United States,* 446 U.S. 398, 100 S.Ct. 1747, 64 L.Ed.2d 381 (1980).[31] In *Busic* the Court held that 18 U.S.C.A. § 924(c), which authorized an enhanced sentence for felonies committed while using a firearm, cannot be applied where a defendant is convicted of violating a statute which itself authorizes enhancement if a dangerous weapon is used. The fallacy of Jackson's argument is that a RICO conspiracy charge cannot be equated with 18 U.S.C.A. § 924(c). In *Busic,* the two enhancement statutes required an identity of elements and of proof. However, as we have previously noted, the RICO conspiracy count in the present case required proof of elements not required for the substantive counts of possession of marijuana with intent to distribute.

We find no error in the cumulative sentences imposed on appellants for RICO conspiracy and possession of marijuana with intent to distribute.

E. The Right to Conflict-Free Counsel

1. James Holt Griffin

The sole basis of Griffin's appeal is that his Sixth Amendment rights were violated by his trial counsel's conflict of interest stemming from his representation of Griffin and five other co-defendants. Although the trial court did not advise Griffin of his right to separate representation in accordance with the dictates of Fed.R.Crim.P. 44(c) and *United States v. Garcia,* 517 F.2d 272 (5th Cir.1975), we have held that this failure does not constitute error requiring reversal unless a defendant can demonstrate an actual conflict of interest. *United States v. Mers,* 701 F.2d 1321, 1326 (11th Cir.1983).

We will not find an actual conflict "unless appellants can point to specific instances in the record to suggest an actual conflict or impairment of their interests." *Id.* at 1328.

> Appellants must make a factual showing of inconsistent interests and must demonstrate that the attorney "made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other. If he did not make such a choice, the conflict remained hypothetical." There is no violation where the conflict is "irrelevant or merely hypothetical"; there must be an "actual, significant conflict."

*Id.* (citations omitted).

"An actual conflict of interest exists if counsel's introduction of probative evidence or plausible arguments that would significantly benefit one defendant would damage the defense of another defendant whom the same counsel is representing." *Baty v. Balkcom,* 661 F.2d 391, 395 (5th Cir. Unit B

---

**31.** The RICO conspiracy statute, 18 U.S.C.A. § 1962(d), carries a maximum punishment of 20 years imprisonment and a $25,000 fine. 18 U.S.C.A. § 1963(a). Possession of marijuana

in excess of 1,000 pounds with intent to distribute authorizes the maximum punishment of fifteen years' imprisonment and a $125,000 fine. 21 U.S.C.A. § 841(b)(6).

1981); *see also United States v. Risi,* 603 F.2d 1193, 1195 (5th Cir.1979) ("[t]here must be a significant divergence in the interests of the jointly represented person in order for an actual conflict to exist.").

In this case, Griffin's counsel employed a "unified front" strategy on behalf of the co-defendants whom he represented on the grounds that the events alleged in the indictment and proved by the government never happened. Griffin argues that this strategy disadvantaged his defense because the evidence against his co-defendants, particularly Larry and Suzette Jackson, was much stronger than that against him. Faced with such evidence, Griffin contends that his trial counsel should have followed a strategy of emphasizing the relative weaknesses of the government's case against him. Similar claims concerning the use of a "unified front" defense have been advanced and rejected in previous cases. *Mers,* 701 F.2d at 1330–31; *United States v. Kranzthor,* 614 F.2d 981, 982–83 (5th Cir.1980); *Canal Zone v. Hodges,* 589 F.2d 207, 210 (5th Cir.1979); *see also United States v. Benavidez,* 664 F.2d 1255, 1259–62 (5th Cir. 1982). The determinative inquiry in such a case is a "specific application of the general principle that to warrant reversal, a conflict of interest must be actual, rather than hypothetical," *Mers,* 701 F.2d at 1331, thus "an alleged conflict of interest that obstructs the use of a strategy or defense is not significant unless the defense is *plausible.*" *Id.* (quoting *Foxworth v. Wainwright,* 516 F.2d 1072, 1080 (5th Cir.1975)) (emphasis in original).

■ Griffin alleges that a plausible alternative strategy to the united front defense chosen by counsel would have been to seek a severance of the two counts on which Griffin was charged; to call jointly represented co-defendants to the stand to exculpate Griffin; to seek to discredit the government's witnesses' identification of James Griffin, rather than James Holt Griffin; to argue the disparities in the evidence between Griffin and his co-defendants in opening argument and at sentencing; and to argue the relatively minor role Griffin played in the operation in relation to his co-defendants.[32]

■ "Failure to adopt a strategy of shifting blame may well give rise to an actual conflict of interest, but to do so the strategy must have been an option realistically available to trial counsel." *Mers,* 701 F.2d at 1331. In this case, there is no evidence that such an option was available to Griffin's counsel. The defenses of Griffin and his co-defendants were not mutually exclusive or inconsistent. The weaknesses of the government's case against Griffin were argued by his counsel in his motion for judgment of acquittal at the close of the government's case. In light of the identification of Griffin by two government witnesses as present during and assisting in the deliveries, along with co-defendants, we do not think that Griffin stood to gain significantly by abandoning the united front defense. Griffin points to no evidence that a co-defendant could have exculpated him. In short, Griffin is unable to show that his counsel sacrificed the rights of one defendant for those of another, and has failed to demonstrate an actual conflict of interest.

## 2. James Carter

■ Carter claims that he was denied the effective representation of counsel due to a lawyer-client conflict. Carter's retained trial counsel were Emmett Johnson and Lewis Groover. Johnson had previously formed corporations for Larry and Suzette Jackson, and on that basis was notified by prosecution that he would be called as a witness at appellants' trial. Johnson filed a

---

**32.** Griffin also contests his counsel's alleged failure to plea bargain in behalf of his client. As a general rule this Court will not review on direct appeal claims of ineffective assistance of counsel where such claims were not raised before the district court and there has been no opportunity to develop and include in the rec-

ord evidence bearing on the merits of the allegations. *United States v. Stephens,* 609 F.2d 230, 234 (5th Cir.1980); *United States v. Rodriguez,* 582 F.2d 1015, 1016 (5th Cir.1978). The record is silent on the issue of plea negotiations in this case.

motion seeking clarification, and the court made a pretrial ruling that Johnson need not withdraw as Carter's counsel. At trial, the government withdrew its request for Johnson to testify, and Johnson with Carter's consent withdrew as trial counsel for Carter. Groover, who also represented defendant Robert Wayne Sapp, continued to represent both Carter and Sapp. At Carter's trial, and before Johnson withdrew, the government announced its intention to call Johnson as a witness. Three tapes were introduced at trial of conversations between Larry Carter and James Carter in which Johnson's name was mentioned.[33]

The only "conflict" here claimed is based on contention that Carter was prejudiced by the announcement that Johnson would be called as a government witness and the fact that his name was mentioned on the tapes. We find that, in light of Carter's active representation by Groover as well as by Johnson prior to Johnson's withdrawal at trial, Carter was not denied his right to effective representation of counsel. Further, we find that Carter has failed to establish any conflict of interest arising from Groover's representation of both Carter and Sapp.

### F. Tax Issues

■ Appellants Larry and Suzette Jackson were charged with tax evasion, in violation of 26 U.S.C.A. § 7201, under Count Six of the indictment. Larry Jackson was also charged in Count Seven with filing a false income tax return, in violation of 26 U.S.C.A. § 7206(1). We reverse the Jacksons' convictions on Count Six, and affirm Larry Jackson's conviction on Count Seven.

To establish a § 7201 violation, the government must prove (1) the existence of a tax deficiency, (2) an affirmative act constituting an evasion or attempted evasion of the tax due, and (3) willfulness. *United States v. Fogg,* 652 F.2d 551, 555 (5th Cir.1981); (*quoting United States v. Hiett,* 581 F.2d 1199, 1200 (5th Cir.1978)). A tax deficiency may be proved by circumstantial evidence: (1) the net worth method, *United States v. Hiett,* 581 F.2d 1199

(5th Cir.1981); (2) the bank deposits method, *United States v. Boulet,* 577 F.2d 1165 (5th Cir.1978); or (3) the cash expenditures method, *United States v. Penosi,* 452 F.2d 217 (5th Cir.1971).

In this case, the government utilized the cash expenditures method of proof. At the close of the trial, the court instructed the jury on the elements of Section 7201. No instructions concerning the cash expenditures method of proof were requested, and none were given. Therefore, we review appellants' challenge to the failure of the court to give explanatory instructions concerning the cash expenditures method of proof under the plain error standard. Fed. R.Crim.P. 30, 52(b).

In *Holland v. United States,* 348 U.S. 121, 129, 75 S.Ct. 127, 132, 99 L.Ed. 150 (1954), the Supreme Court recognized the dangers inherent in utilizing the net worth method:

While we cannot say that [the] pitfalls inherent in the net worth method foreclose its use, they do require the exercise of great care and restraint. The complexity of the problem is such that it cannot be met merely by the application of general rules. Trial courts should approach these cases in the full realization that the taxpayer may be ensnared in a system which, though difficult for the prosecution to utilize, is equally hard for the defendant to refute. *Charges should be especially clear, including, in addition to the formal instructions, a summary of the nature of the net worth method and the assumptions on which it rests, and the inferences available both for and against the accused.*

(emphasis supplied) (citation omitted).

This language is clear; we therefore hold that *Holland* sets forth the standards governing and requiring explanatory instructions in a net worth method case. *Accord United States v. Hall,* 650 F.2d 994, 998 (9th Cir.1981); *United States v. Tolbert,* 367 F.2d 778, 780–81 (7th Cir.1966); *United States v. O'Connor,* 237 F.2d 466, 472–73 (2d Cir.1956); *see also United States v. Meri-*

---

**33.** Gov.Exs. 17A & 17B; 18A & 18B; 24A & 24B.

*wether,* 440 F.2d 753, 756–57 (5th Cir.1971) (reversing Section 7201 conviction; trial court failed to instruct jury on method of proof).

Further, we find no principled basis for distinguishing between the *Holland* mandated explanatory jury instructions concerning the net worth method of proof and the present cash expenditures method: both invoke the same concerns regarding the defendant's right to a fair trial based on the jury's understanding of the method of proof utilized by the prosecution. *See United States v. Newman,* 468 F.2d 791, 793 (5th Cir.1972) ("The 'expenditures' method [is] a simple variant of the 'net worth method.' "). In sum, we hold that in Section 7201 cases utilizing the cash expenditures method of proof, as well as the net worth method, *Holland* requires that the trial court charge the jury concerning the nature of the cash expenditures method and the assumptions on which it rests, and the inferences available both for and against the accused.

We now determine if the omission of such explanatory instructions required by *Holland* constitutes plain error. Plain error exists where a highly prejudicial error affects the defendant's substantial rights. *United States v. Herzog,* 632 F.2d 469, 472 (5th Cir.1980). The plain error rule will not be invoked unless the omission of the instructions is error so grave as to result in a likelihood of a miscarriage of justice or to seriously affect the fairness, integrity or public reputation of the judicial proceedings. *See United States v. McMahon,* 715 F.2d 498, 500 (11th Cir.1983). We find that the omission of the required explanatory instructions concerning the cash expenditures method of proof in this case "goes to the very basis of the jury's ability to evaluate the evidence," *Hall,* 650 F.2d at 999, and to the very core of the deliberative process necessary to guarantee the fairness of the proceedings. We therefore hold that the omission of the explanatory instructions required by *Holland* concerning the cash

expenditure method of proof constituted plain error affecting appellant's substantial rights. *See id.; Tolbert,* 367 F.2d at 781; *see also Meriwether,* 440 F.2d at 756–57. We reverse the Jacksons' convictions on Count Six.

Larry Jackson contests his conviction on Count Seven of filing a false income tax return, in violation of 26 U.S.C.A. § 7206(1), on the grounds that the government failed to establish the element of an opening net worth required in Section 7201 cash expenditures method prosecutions to prove taxable income. *See United States v. Marshall,* 557 F.2d 527, 529 (5th Cir.1977). Section 7206(1) is a fraud statute and, unlike Section 7201, does not require the prosecution to prove the existence of any taxable income. *United States v. Taylor,* 574 F.2d 232, 234 (5th Cir.1978).

> [T]he section [7206(1)] requires simply that the government prove that defendant willfully made and subscribed a return, that it contained a written declaration that it was made under penalties of perjury, and that the defendant did not believe the return to be true and correct as to every material matter. *Id.*

This burden was met in the present case, and we affirm Larry Jackson's conviction on Count Seven.[34]

## IV. CONCLUSION

We AFFIRM the appellants' convictions on each count charged in the indictment, with the exception of the convictions of Larry Jackson and Suzette Jackson on Count Six, which we REVERSE.

---

**34.** Larry Jackson also claims that the imposition of a sentence under Count Seven is improper because a Section 7206(1) offense is a

lesser-included offense under Section 7201. As we reverse Jackson's conviction on Count Six, we do not reach this issue.