COMMONWEALTH vs. ANTHONY R. POPE.

Essex.  December 4, 1985. — April 11, 1986.

Present: WILKINS, LIACOS, ABRAMS, NOLAN, & LYNCH, JJ.

*Homicide. Accessory. Evidence,* Hearsay, Declaration against interest, State
of mind, Declaration of deceased person.

At the trial of an indictment under G. L. c. 274, § 2, for being an accessory
before the fact to murder in the first degree, a suicide note written by
the woman who had been identified as the principal felon, in which she
admitted shooting the victim, could not properly be admitted in evidence
as part of the Commonwealth's case under the exception to the hearsay
rule for declarations against penal interest [278-281]; under the "state
of mind" exception [281]; or under any residual or "innominate" excep-
tion urged by the Commonwealth [281-282].
At the trial of an indictment under G. L. c. 274, § 2, for being an accessory
before the fact to murder in the first degree, the erroneous admission in
evidence of a suicide note by the principal felon, in which she admitted
shooting the victim, necessitated the reversal of the defendant's convic-
tion but did not entitle him to a required finding of not guilty where,
on the other evidence, the jury would have been warranted in finding
that the principal felon killed the victim with deliberately premeditated
malice aforethought, that the defendant had given her the gun used in
committing the crime, and that, when he did so, he shared her intent to
kill the victim. [282-284]

INDICTMENTS found and returned in the Superior Court De-
partment on March 24, 1982.

The cases were tried before *Francis W. Keating,* J.

The Supreme Judicial Court granted a request for direct
appellate review.

*Harry L. Manion, III (William A. Curry* with him) for the
defendant.

*Edward F. Connelly,* Assistant District Attorney, for the
Commonwealth.

ABRAMS, J. On November 15, 1981, the bodies of James
F. Black and Penny A. Mathewson were found in Black's

condominium at Pickering Wharf in Salem. Black had been shot twice in the head; Mathewson had been shot once in the head in an apparent murder-suicide. The defendant, Anthony R. Pope, was tried and convicted under G. L. c. 274, § 2,[1] as an accessory before the fact to the murder in the first degree of Black and for unlawfully carrying a firearm.[2] He was sentenced to a term of life imprisonment at the Massachusetts Correctional Institution at Cedar Junction. The defendant appeals, arguing that the judge erred in allowing Mathewson's suicide note to be admitted in evidence as a statement against penal interest. We agree. We now reverse and order a new trial.

We briefly review the facts. In July, 1981, Mathewson began dating Black and later that month moved into his condominium at Pickering Wharf. The preceding month, the defendant had begun working as a security guard at Pickering Wharf, having obtained the job with the help of Richard Pigeon, the supervisor of security guards at the condominium complex. Both Pigeon and the defendant became friendly with Mathewson. The defendant testified that Pigeon visited Mathewson in Black's apartment, told the defendant that he had "a good thing going," and warned him to stay away from her. He also testified that Mathewson believed she was pregnant by Pigeon. The defendant admitted that despite Pigeon's warning, he fell in love with Mathewson and planned to marry her.

As the defendant's relationship with Mathewson developed in September and October, 1981, her relationship with Black deteriorated. On November 2, 1981, she moved out of Black's apartment and back into her parents' home, but still continued

---

[1] General Laws c. 274, § 2 (1984 ed.), provides: "Whoever aids in the commission of a felony, or is accessory thereto before the fact by counselling, hiring or otherwise procuring such felony to be committed, shall be punished in the manner provided for the punishment of the principal felon."

[2] Although the defendant claimed an appeal from that conviction, he does not argue any error concerning that conviction. "We deem [Pope's] failure to brief these issues as a waiver. An 'appellate court need not pass upon questions or issues not argued in the brief.' Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975)." *Commonwealth* v. *Cundriff,* 382 Mass. 137, 151 n.22 (1980), cert. denied, 451 U.S. 973 (1981). We add that the evidence of the charge of unlawfully carrying a firearm was independent of the issue of the declaration against penal interest and thus is not affected by our resolution of that issue.

to see Black on a daily basis. Pigeon testified that, around this time, the defendant confided that he wished Black was no longer around and that "he [Black] was just getting in the way between him [the defendant] and Penny." On November 4, 1981, the defendant asked one Joseph Banville for assistance in finding an unmarked gun, or if he could buy one of Banville's pistols.[3] Banville refused. On November 13, the defendant again met Banville and asked to borrow a pistol for target practice. Banville agreed, and handed the defendant a .38 caliber Smith & Wesson revolver, along with six bullets. Later that day, according to Pigeon's testimony, the defendant showed the gun to Pigeon and told him that it was for Mathewson to use to shoot Black.

That evening, the defendant and Mathewson had dinner together and then met another couple for coffee and dessert. Around 2:45 A.M. on November 14, the defendant drove Mathewson to the entrance of the condominium complex. According to the defendant, Mathewson intended to sleep on the couch in Black's apartment, and to return his keys the next morning. Earlier Black had told a companion that Mathewson was "doing allright" over their breakup, and that she had arranged to meet him in the morning to return the keys to the condominium.

When Mathewson did not return home, her parents searched for her. On November 15, the Mathewsons went to the guard shack at Pickering Wharf and told the defendant that they had to get into Black's apartment. Pigeon summoned a locksmith. The locksmith opened the door to the apartment and entered with Pigeon. They found Black's body, naked and covered with blood, in his bed. The locksmith then picked the lock to the bathroom, but Pigeon was unable to open the door because of an obstruction. Pigeon then telephoned the Salem police. A State police detective arrived and pushed open the blocked bathroom door. He heard a metallic object fall to the floor and inside the bathroom discovered Mathewson's body and Banville's

[3] Banville was the uncle of both the defendant's ex-wife and Pigeon's wife's former husband. He was granted immunity from prosecution in exchange for his testimony.

gun. The police also found an open woman's handbag and a gold chain on the bedroom floor, and downstairs found a pair of woman's shoes, a coat with a pair of rubber gloves in the pocket, and Mathewson's wallet. Inside the wallet was a suicide note written by Mathewson, in which she stated, "I killed Jimmy."[4]

The police initially considered the case to be a murder-suicide and did not suspect anyone else. They did not conduct paraffin tests on Mathewson or anyone else to determine who had fired the gun, nor were fingerprints found on the gun. No autopsies were done on the bodies at that time.[5] The police interviewed the defendant on November 15; he freely admitted his relationship with Mathewson, but denied any knowledge of the gun. The police also interviewed Pigeon that day, and he made no mention of the gun or of any statement by the defendant that the gun was for Mathewson to kill Black. Pigeon did not give information concerning the defendant's alleged involvement until March 30, 1982, following the defendant's indictment on March 24, 1982.

1. At trial, the Commonwealth offered Mathewson's suicide note. The defendant objected. The judge allowed the note to be admitted under the exception to the hearsay rule for admissions against penal interest. On appeal, the defendant argues that the note was neither contrary to Mathewson's penal interest

---

[4] The handwriting on the note was authenticated by Mathewson's mother. The full text of the note was as follows: "Dear Mom and Dad, Terry and Carol. Some day I hope you'll understand. I guess you could say I gave up. I love Jimmy, and maybe I snapped, but I can't go on. I love you all, but I don't think we could have made it through this one. I killed Jimmy. If I can't have him, no one else will. Not that he would be capable of loving anyone; but I don't want to live without him, and if this is the only way I can be with him, this is what I must do. I am at peace now. I can hurt no man. Please go on. I will be with you in spirit, and I love you all deeply. Take care of my baby and Sam, and we will see each other some day. I only have one request. Please bury Jimmy and I together. I love you all. Penny."

[5] The bodies were later exhumed, and autopsies were performed on March 3, 1982, three and one-half months after the deaths. The medical examiner could not state, with reasonable medical certainty, the exact time of death. The physical evidence suggests that Black died first.

at the time it was written, nor sufficiently corroborated to qualify under the penal interest exception.

In *Commonwealth* v. *Carr,* 373 Mass. 617 (1977), we adopted in substance principles expressed in Rule 804(b)(3) of the Federal Rules of Evidence (1985),[6] governing the admissibility of statements against interest. *Id.* at 623. We recently reviewed in detail the requirements for admissibility of statements against penal interest. *Commonwealth* v. *Drew, ante* 65, 73-78 (1986). A statement is admissible under the penal interest exception if the declarant's testimony is unavailable, the statement so far tends to subject the declarant to criminal liability that a reasonable person in his position would not have made the statement unless he believed it to be true, and the statement, if offered to exculpate the accused, is corroborated by circumstances clearly indicating its trustworthiness. *Id.* at 73. *United States* v. *Thomas,* 571 F.2d 285, 288 (5th Cir. 1978). See Proposed Mass. R. Evid. 804 (b) (3).

In this case, the declarant, Mathewson, was dead and therefore unavailable. However, Mathewson's suicide note fails to meet the second prerequisite, that the statement be against the declarant's penal interest to the degree required under the principles of the rule. The Commonwealth focuses on the admission, "I killed Jimmy," and argues that the statement would have subjected Mathewson to criminal liability. The Commonwealth's approach ignores the context in which the admission was made and the declarant's state of mind and awareness of potential criminal penalty. *Commonwealth* v. *Drew, supra* at 74. Tague, Perils of the Rulemaking Process: The Development, Application, and Unconstitutionality of Rule 804(b)(3)'s

---

[6] Rule 804 (b) (3) provides: "(b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness: . . . (3) Statement against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

Penal Interest Exception, 69 Geo. L.J. 851, 941 (1981). The issue is not whether a "reasonable person" would decide to commit suicide, nor is it whether the statement would in other circumstances subject the declarant to criminal penalty. Instead, the question is whether, *because of concern of the penal consequences,* a person who had already decided to commit suicide would not make an inculpatory statement unless he or she believed it to be true. A person who is about to commit suicide faces no penal consequences for any statement made just before death. *State* v. *Hodge,* 655 S.W.2d 738, 743 (Mo. Ct. App. 1983). We do not believe that concern for penal consequence would inspire a suicide victim to truthfulness. See, e.g., *People* v. *Shortridge,* 65 N.Y.2d 309 (1985). Although such a person might be inspired to truthfulness for other reasons, those reasons do not render the person's suicide note admissible under the penal interest exception to the hearsay rule. Apart from these general observations, there is no evidence, either in the note itself or elsewhere, to suggest that Mathewson's state of mind was such that she entertained thoughts of the incriminating nature of her note. Mathewson's note was not, therefore, sufficiently against her penal interest. It was error to admit the note. See *State* v. *Hodge, supra; People* v. *Shortridge, supra.*

We need not decide whether the government must satisfy the same standard of clear corroboration when it introduces an *inculpatory* statement against penal interest as must the defendant before introducing an *exculpatory* statement against penal interest. See *Commonwealth* v. *Drew, supra* at 75-77. We note, however, that despite the language of the rule, courts and commentators have concluded the same standard of "clear corroboration" of trustworthiness that applies to admission of exculpatory statements should also be applied to inculpatory statements.[7] See *United States* v. *Riley,* 657 F.2d 1377 (8th

---

[7] The corroboration requirement for *inculpatory* statements should not be applied with such leniency that the defendant's confrontation rights are violated. Cf. *Commonwealth* v. *Drew, supra* at 75 n.10.

Cir. 1981); *United States* v. *Palumbo,* 639 F.2d 123, 130-134 (3d Cir.), cert. denied, 454 U.S. 819 (1981) (Adams, J., concurring); *United States* v. *Alvarez,* 584 F.2d 694, 701 (5th Cir. 1978); *State* v. *Canaday,* 141 Ariz. 31 (Ct. App. 1984); *People* v. *Moore,* 693 P.2d 388 (Colo. Ct. App. 1984); *Maugeri* v. *State,* 460 So. 2d 975 (Fla. Dist. Ct. App. 1984); *People* v. *Maerling,* 46 N.Y.2d 289, 298-299 (1978); *State* v. *Ng,* 104 Wash. 2d 763 (1985); Tague, Perils of the Rulemaking Process, *supra* at 892, 897, 989-998; Comment, Federal Rule of Evidence 804(b)(3) and Inculpatory Statements Against Penal Interest, 66 Calif. L. Rev. 1189 (1978); 4 J. Weinstein & M. Berger, Evidence § 804(b)(3)[03], at 804-150 — 804-156 (1985).

2. The Commonwealth argues two alternative grounds for admitting Mathewson's note. First, the Commonwealth suggests that the note is admissible under the state of mind exception, because it shows Mathewson's intent to kill Black, her premeditation, and her motive for killing him. This exception applies only to the declarant's present intent to act, not to past conduct. *Shepard* v. *United States,* 290 U.S. 96, 105-106 (1933). See McCormick, Evidence § 296 (3d ed. 1984). The note reads, "I killed Jimmy," and therefore does not disclose a future intent to kill Black.

The Commonwealth also argues that the note was admissible under the "innominate" or residual exception to the hearsay rule recognized in Fed. R. Evid. 804 (b)(5).[8] We have twice

---

[8] Rule 804 (b) (5) provides: "Other exceptions. A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant."

rejected suggestions that such a rule should be adopted. See *Commonwealth* v. *Meech,* 380 Mass. 490, 497 (1980); *Commonwealth* v. *White,* 370 Mass. 703, 713 (1976). Although "we do not regard the common law hearsay exceptions as frozen in their established contours, and have been prepared on suitable occasions to venture forth," *Meech, supra,* we see no reason to adopt the rather broad Federal formulation as a general rule.[9] Nor is the exception appropriate in this particular case. There is no indication on the record that the Commonwealth gave the defendant notice of its intent to offer the note. Additionally, the Commonwealth adduced no evidence concerning the time and circumstances in which this note was written. Thus, we cannot say that the statement bears "equivalent circumstantial guarantees of trustworthiness," which is a predicate to the application of the Federal rule.

The admission of the note was error, and there can be little doubt that the error was prejudicial. The note is a particularly persuasive element of the case against the defendant because it suggests that Mathewson, the principal, acted with deliberately premeditated malice aforethought.

The defendant argues that, without the note, there was insufficient evidence to establish that Mathewson would have been guilty of first or second degree murder.[10] We most recently

[9] The Federal courts "have neither interpreted nor applied the residual exceptions consistently with their purposes or terms." Sonenshein, The Residual Exceptions to the Federal Hearsay Rule: Two Exceptions in Search of a Rule, 57 N.Y.U.L. Rev. 867, 867 (1982). We do not believe the administration of justice in this Commonwealth would be advanced by adoption of a rule whose application in practice has been marked by conflicting and illogical results. See Harris, Catch (24): Residual Hearsay, 12 Litigation 10, 10-15, 64 (No. 1, 1985).

[10] At the end of the Commonwealth's opening, at the close of the Commonwealth's evidence, and at the close of all the evidence the defendant moved for a required finding of not guilty. The first motion was premature; the judge need not have ruled on the motion until after the Commonwealth's evidence was closed. We consider the sufficiency of the evidence at the close of the Commonwealth's case, exclusive of the suicide note. We also consider the evidence at the close of all the evidence to determine whether the Commonwealth's position as to proof had deteriorated since it had closed its case. *Commonwealth* v. *Basch,* 386 Mass. 620, 622 n.2 (1982). The Commonwealth's position as to proof did not deteriorate.

discussed the standards for reviewing the denial of a motion for a required finding of not guilty in *Commonwealth* v. *Anderson,* 396 Mass. 306, 311-312 (1985); we need not repeat that discussion here. We conclude that, viewed in the light most favorable to the Commonwealth, the evidence received, independent of the suicide note, was sufficient to satisfy a rational trier of fact of each element of the crime beyond a reasonable doubt. *Commonwealth* v. *Basch,* 386 Mass. 620, 622 (1982).

The defendant was tried under G. L. c. 274, § 2, which states that accessories before the fact shall be indicted, tried, and punished as principals.[11] See *Commonwealth* v. *Richards,* 363 Mass. 299, 307 n.2 (1973). Consequently, the Commonwealth had to show, first, that Mathewson killed Black with deliberately premeditated malice aforethought and, second, that the defendant assisted Mathewson in the commission of this crime while sharing with her the mental state required for murder in the first degree, or, in the absence of deliberate premeditation, murder in the second degree.

Banville testified that he gave a gun to the defendant. Pigeon testified that the defendant showed him the gun and told him that the gun was for Mathewson to kill Black. The gun was found with Mathewson's body, behind the locked door of the bathroom. Two bullets fired from the gun killed Black. Black had been shot from close range, probably from two to four feet. There was no sign of struggle.[12] Mathewson died of a single bullet wound, inflicted from point-blank range.

From the physical evidence, the jury would have been warranted in drawing the inference that Mathewson shot Black. From the use of a deadly weapon and the fact that Black was shot twice in the head with no sign of struggle, the jury could have inferred that Mathewson decided to carry out the act that killed Black after some period of reflection, however brief.

---

[11] See note 1, *supra.*

[12] The defendant introduced evidence which he argues shows that Pigeon had the opportunity to tamper with the evidence in Black's apartment. The jury would have been entitled to disbelieve the evidence of tampering. We do not review the weight of the evidence.

*Commonwealth* v. *Anderson, supra* at 312. *Commonwealth* v. *Basch, supra* at 622. This evidence was sufficient to permit the jury to find that Mathewson killed Black with deliberately premeditated malice aforethought. *Commonwealth* v. *LeBlanc,* 373 Mass. 478 (1977). From Pigeon's testimony and the use of the gun shown him by the defendant, the jury could infer that the defendant gave the gun to Mathewson and that he did so while sharing Mathewson's intent to kill Black. That is sufficient to meet the statutory standard. See note 1, *supra.* While we do not share the Commonwealth's certitude that the evidence, independent of the suicide note, was "overwhelming," the evidence was "substantial enough so that the question of guilt [would not have been] left to conjecture or surmise," *Commonwealth* v. *Anderson, supra* at 313, and was therefore sufficient to warrant submission of the case to the jury.[13]

The judgment on the indictment for unlawfully carrying a firearm is affirmed. See note 2, *supra.* On the indictment as accessory before the fact to murder in the first degree, the judgment is reversed, the verdict set aside, and the case remanded to the Superior Court for a new trial.

*So ordered.*

---

[13] The defendant also argues that in the circumstances of this case, trial under G. L. c. 274, § 3 (1984 ed.) (which allows trial of an accessory before the fact even where the principal felon is not amenable to justice), denied him his due process rights by shifting to the defendant "the burden of establishing the absence of the deceased principal's guilt." We do not read the statute as relieving the Commonwealth of its burden of establishing beyond a reasonable doubt all the elements of the principal's crime.