COMMONWEALTH vs. WINSTON W. JAMES.[1]

No. 90-P-424.

Hampden. October 16, 1990. - April 26, 1991.

Present: WARNER, C.J., KAPLAN, ARMSTRONG, BROWN, PERRETTA, DREBEN, KASS, SMITH, FINE, JACOBS, GILLERMAN, PORADA, IRELAND, GREENBERG, & LAURENCE, JJ.

*Controlled Substances. Accessory and Principal. Joint Enterprise.*

At the trial of an indictment charging trafficking in cocaine the evidence was sufficient to warrant the inference that the defendant knew of the stash of cocaine in a certain apartment, that he was carrying cocaine that came from the same stash, and that he was a joint venturer in the crime of trafficking in cocaine, thus the defendant was properly charged and convicted as a principal. [493-500] GILLERMAN, J., dissenting, with whom KAPLAN, SMITH, FINE, JACOBS, PORADA, & GREENBERG, JJ., joined.

The evidence at a criminal trial was insufficient to connect the defendant to a quantity of marihuana found in a certain apartment, and his conviction for possession of marihuana with intent to distribute could not be sustained. [500]

INDICTMENTS found and returned in the Superior Court Department on December 18, 1987.

The cases were tried before *John F. Moriarty*, J.

*Roy H. Anderson* for the defendant.

*Michael J. Hickson*, Assistant District Attorney, for the Commonwealth.

ARMSTRONG, J. On the evening of October 29, 1987, Springfield police officers approached 55 Reed Street, Springfield, to execute a warrant to search the third-floor apartment. Several persons were standing on the first-floor

---

[1]This case was initially heard by a panel comprised of Justices Armstrong, Kaplan, and Gillerman and was thereafter submitted on the record and briefs to the other Justices of the Appeals Court, all of whom took part in the decision of this case in accordance with the provisions of Mass.R.A.P. 24(a), 365 Mass. 872 (1974).

porch or in a doorway to a staircase that led to the second and third-floor apartments. They began shouting warnings that the police were coming and fled up the stairs to the third-floor apartment.[2] The defendant James, who was on the porch, was evidently the last to flee into the house, and he slammed the door shut on the first of the police officers, John O'Mara. The defendant ran up the stairway with Officer O'Mara ten feet behind, followed by other officers. When the defendant reached the third-floor apartment, he tried to enter it but the door had been locked. (The police heard cries within, "Police, lock the door.") Officer O'Mara saw the defendant drop a plastic bag in the hall outside the apartment. The defendant fled to the third-floor porch. O'Mara kicked in the door of the apartment and entered the living room. Other officers, Sergeants Thomas Kelly and Kevin Dudley, followed the defendant. They saw him "crouched in a ball" in a corner of the porch; nearby were plastic bags. As he tried to climb to the roof, officers seized and arrested him. Retrieved from the hallway floor outside the apartment was a plastic bag containing eight smaller plastic bags of cocaine weighing a total of 3.31 grams and from the porch, five bags of cocaine weighing 1.77 grams; altogether 5.08 grams, recognized by the officers as crack cocaine in white chunk form,[3]

---

[2]The officer who so testified, John O'Mara, acknowledged he could not see the movements of the persons who ran into the doorway ahead of the defendant James. Officer O'Mara's inference that they "ran up into the apartment" was apparently based on James's being the only person left in the hallway. There was no motion to strike and no further exploration of the subject. The suggestion in the dissenting opinion, at note 12, that the other people on the porch "may well have dispersed but . . . the transcript is silent as to where the people went," makes the error of viewing the evidence in the light *least* favorable to the Commonwealth. It is axiomatic that a guilty verdict must be measured by "viewing the evidence in light most favorable to the prosecution." *Commonwealth* v. *Nardone*, 406 Mass. 123, 129 (1989), quoting from *Jackson* v. *Virginia*, 443 U.S. 307, 319 (1979).

[3]"Crack" cocaine, as distinguished from ordinary cocaine (cocaine hydrochloride, or cocaine HCl), a powder usually ingested by inhalation, is cocaine that has been converted into "freebase," a chunk or crystalline form ingested by smoking. Crack generally sells more cheaply than cocaine HCl, and it produces a shorter but more intense "high," followed by a more intense depression, than the powdered, inhaled form. It is reported

with a street value of fifty dollars a bag (a "jumbo"), or $650 in all. The defendant had on his person $265 in cash. He told the police that he lived in Miami but was staying at 55 Reed Street.

O'Mara and other officers, upon entering the living room of the apartment, encountered Courtney McKenzie, Donald Johnson, and George A. Smith (aka Steven DePriest). On the floor beside them were six plastic bags of cocaine with a total weight of 2.55 grams, also one bag of cocaine weighing 0.55 grams. Under the living room couch the officers found a large plastic bag containing eighty bags of cocaine, together weighing 26.24 grams. The grand total of cocaine in the apartment was thus 29.34 grams. All was in the form of white chunks, recognized by the officers as crack cocaine, packaged (like the crack the defendant had dropped) in fifty dollar bags. The cocaine found in the apartment thus had a street value of $4,350.

In the back bedroom the officers found Angela McKenzie (aka Angela Wiley) and another woman and a considerable amount of marihuana, some packaged in small ("dime") bags, some unpackaged, and a supply of empty dime-size bags.

After further search of the apartment, the officers recovered from a bureau drawer in another bedroom a .25 caliber Browning automatic pistol with an empty clip, together with ammunition of a larger caliber. The police also found a bill from a Holiday Inn in the name of Steven DePriest and pa-

---

also to be more addictive. The percentage of cocaine HCl in crack has been found to range from forty percent to ninety percent. See Note, Police Tactics, Drug Trafficking, and Gang Violence, 64 Notre Dame L. Rev. 552, 559, nn. 37 & 38 (1989); Comment, Aider and Abettor Liability, the Continuing Criminal Enterprise, and Street Gangs, 81 Crim. L. & Criminology 348, 348-349 n.5 (1990); Skolnick, A Critical Look at the National Drug Control Strategy, 8 Yale L. & Pol'y Rev. 75, 97-98 (1990); Reinarman & Levine, Crack in Context, 16 Contemp. Drug Problems 535, 539-540 (1989); Fagan & Chin, Initiation into Crack and Cocaine, 16 Contemp. Drug Probs. 579, 580, 591-593, 611 n.9 (1989); Kleiman & Saiger, Drug Legalization: Asking the Right Question, 18 Hofstra L. Rev. 527, 561-562 (1990); Loken & Kennedy, Legal Cocaine and Kids, 18 Hofstra L. Rev. 567, 570 n.19 (1990).

pers belonging to others, including papers of the defendant; the testimony does not disclose the nature of these papers or the place or places in the apartment where they were found. Courtney McKenzie had $330 on his person, Johnson $250, Smith $76, and Angela McKenzie $171.

The foregoing account summarizes facts that could have been found by a jury upon the trial of the defendant James and a codefendant, George A. Smith, in Superior Court. The crimes charged against the defendant were possession of cocaine with intent to distribute, possession of marihuana with intent to distribute, and trafficking in cocaine (weight in excess of twenty-eight grams). The jury brought in guilty verdicts and judgments of conviction followed, the conviction of possession with intent to distribute being dismissed as duplicative.

On appeal the defendant contests all the convictions as being unwarranted by the evidence. He claims in particular that the evidence was not sufficient to connect him to the cocaine inside the third-floor apartment, a connection that was essential to the trafficking conviction,[4] and, while he does not question the sufficiency of the evidence to show his possession of the thirteen bags of cocaine (eight from the hallway, five from the porch) that marked his path of flight, he contends that the aggregate amount, 5.09 grams, with a value of $650, was as consistent with personal use as with an intent to sell. See *Commonwealth* v. *Wooden*, 13 Mass. App. Ct. 417, 422-424 (1982); *Commonwealth* v. *Sendele*, 18 Mass. App. Ct. 755, 758 & n.10 (1984). This issue we need

---

[4]Possession with intent to distribute cocaine, G. L. c. 94C, § 32A(*a*), differs from "trafficking" in cocaine (G. L. c. 94C, § 32E[*b*])("trafficking" is defined to include possession with intent to distribute) by the absence of a quantity element: the trafficking statute requires now (since St. 1988, c. 124) a weight of fourteen grams or more of cocaine, without regard to purity. The trafficking statute sets out escalating penalties for amounts of certain drugs in excess of specified minima: the cocaine subsection (§ 32E[*b*]) provides higher penalties for amounts equal to or greater than twenty-eight grams, 100 grams, and 200 grams. Under § 32E(*b*) as in effect in 1987, when the events related in the text occurred, twenty-eight grams was the minimum quantity to constitute trafficking.

not face if the judge was correct in ruling that the evidence warranted an inference of the defendant's complicity in possessing and distributing the cocaine found inside the apartment.

In the view of a majority of the court, the jury could properly find on the foregoing evidence that the third-floor apartment at 55 Reed Street was the base of a cocaine distribution operation (the base in the sense that it was the location of the stash, if not also the place from which sales were made) and that the defendant James was implicated in the operation, if not as one of the persons who had actual or constructive possession of the stash, at least as one who aided and assisted those persons in the possession and distribution of the cocaine in the stash. Three strands of evidence, overlapping to some extent, warranted that inference.

First, there was evidence that established the nexus between James and the apartment, evidence that would support a finding that James was living there (even if only temporarily). He admitted to the police that he was "staying at 55 Reed Street," meaning in context that he was staying in one of the three apartments at that address. When the police arrived, he followed others through the door and up the stairs that led to the second and third-floor apartments.[5] He attempted to follow the others into the third-floor apartment and would have done so, presumably, if the door had not by then been locked. Papers belonging to the defendant were found inside the third-floor apartment.[6]

---

[5]The evidence implied, and the defendant in his brief states, that 55 Reed Street consists of three apartments. A police officer indicated that there were two front doors, one for the first-floor apartment, which is not involved in this case, the other opening to a common stairwell leading to the second and third-floor apartments.

[6]The dissenting opinion suggests (in note 13) that there may be error in the transcript at this point, that the actual testimony may have been to the effect that *no* papers of the defendant were found in the apartment. The defendant has not suggested that the transcript is in error, despite the fact that the Commonwealth has argued the significance of the papers in its brief and at argument. An appellate court normally deems itself bound by the record as it receives it, *Sweezey* v. *Mayor of Malden*, 273 Mass. 536, 537 (1931); *Commonwealth* v. *Bannister*, 15 Mass. App. Ct. 71, 81 n.8

Second, there was the evidence that the bags of cocaine that the defendant was discarding were apparently indistinguishable in content and packaging from those found by the police inside the apartment. While the laboratory certificates did not specify the type or the purity of cocaine in the separate packages,[7] the narcotics officers, some of whom had extensive experience in narcotics investigations and seizures, identified the white chunks in all the bags as crack cocaine, describing in some detail how it had been manufactured and the method by which it had been packaged, all in $50 bags, or "jumbos." The judge sustained an objection to a question whether certain samples "appear[ed] consistent," because the jury, which had all the samples before them, could judge for itself. With the jury looking at the samples, the prosecutor urged them to draw conclusions from their similarity, and the defendant's counsel, acknowledging the similarity, argued that the evidence was equally consistent with the defendant's being a buyer as with his being a seller. Without the bags before us, we have no basis for assuming that the jury could not properly infer from their appearance and from the expert testimony of the narcotics officers that the defendant's thirteen bags were identical in content and packaging to those in the large cache.

In some cases a defendant's connection to a stash of narcotic drugs has been established largely by the close similarity of the narcotic drugs in his actual possession (i.e., on his person) to the narcotic drugs in the stash. See, e.g., *Commonwealth* v. *Brown*, 12 Mass. App. Ct. 988 (1981), where

---

(1983), the traditional rule being that errors in the record must be corrected before argument, normally in the trial court under the procedure set forth in Mass.R.A.P. 8(e), as amended, 378 Mass. 934 (1979). *Ibid.*

[7]Using the statutory terminology, the laboratory certificates from the Department of Public Health identified each of the cocaine samples, including the thirteen bags dropped by the defendant and the eighty bags found under the living room sofa, only as "white chunks, contained in [number] plastic bags . . . found to contain: Cocaine, a derivative of coca leaves, as defined in Chapter 94C, Controlled Substance Act, Section 31, Class B." The statute does not distinguish between ordinary cocaine and crack cocaine. The laboratory did assay the contents of the stash, finding the cocaine to be 82.48 percent pure.

the defendant was convicted of possessing marihuana with intent to distribute based on evidence that the small quantity in his variety store, with manila envelopes, was replicated in a large cache of marihuana, with identical manila envelopes, found in the home of his former wife, where the defendant was "more than a casual visitor." 12 Mass. App. Ct. at 989. See also *Commonwealth* v. *Pratt*, 407 Mass. 647, 652 (1990). Examples from other States are numerous.[8] The validity of such an inference depends on many circumstances,

---

[8]Out-of-State cases applying similar reasoning include: *United States* v. *Smith*, 520 F.2d 74, 76 (D.C. Cir. 1975)(marihuana in street below apartment window linked to marihuana in apartment by similar bags); *United States* v. *Arango*, 853 F.2d 818, 826 (11th Cir. 1988)(traces of cocaine on clothing linked defendants to stash); *Korreckt* v. *State*, 507 So. 2d 558, 564-566 (Ala. Crim. App. 1986)(defendant's convictions affirmed as to cocaine found hidden in house he shared with wife and children, based on cocaine residue on a straw he carried, but reversed as to cocaine found in truck borrowed from a friend, the latter cocaine being diluted with a different cutting agent [lactose as opposed to inositol]); *Blanco* v. *State*, 515 So. 2d 115, 121 (Ala. Crim. App. 1987)(cocaine on defendant's person diluted with same distinctive cutting agent [boric acid] as that in large cache in truck in which defendant had been a passenger); *People* v. *Mac-Arthur*, 126 Cal. App. 2d 232, 235-237 (1954) (inference that defendant possessed heroin packaged in rubber finger stalls in his shared apartment based on evidence that defendant had earlier sold heroin packaged in rubber finger stalls to an undercover officer); *People* v. *Monson*, 255 Cal. App. 2d 689, 692-693 (1967)(defendant's admission that she used heroin permitted inference that she was in possession of heroin, but not marihuana, found in house she shared with male friend); *People* v. *Brownstein*, 105 Ill. App. 3d 459, 465-466 (1982)(defendant's possession of thirteen bags of cocaine warranted inference that he possessed cocaine and marihuana in room he shared with girlfriend as a bedroom and with others as a TV room); *State* v. *Stewart*, 542 S.W.2d 533, 538-539 (Mo. Ct. App. 1976)(defendant's possession of freshly cut marihuana in house owned by others inferred from defendant's presence therein coupled with the presence of freshly cut marihuana in the defendant's rented van); *People* v. *Salas*, 451 S.W.2d 504, 505 (Tex. Crim. App. 1970)(marihuana in car attributed to passenger who had marihuana residue in pocket). To same effect see *Duran* v. *People*, 145 Colo. 563, 564-566 (1961). Contrast *United States* v. *Herrera*, 757 F.2d 144 (7th Cir. 1985)(heroin found in footlocker differed in purity from that carried by defendant); *Ridgeway* v. *State*, 187 Ga. App. 381, 381-382 (1988)(cocaine found on defendant's person packaged differently from cocaine found in apartment); *People* v. *Davenport*, 39 Mich. App. 252, 254-258 (1972)(defendant's possession of marihuana not a sufficient basis for inference that he possessed heroin found in house he shared with three others).

such as the distinctiveness of the packaging; and a close simi-
larity, while it may support an inference that the personally
held sample came from the stash, does not by itself establish
the relation of the person holding the sample to the stash. (In
this connection, the jury had a basis, as the prosecutor ar-
gued, for excluding the possibility that the defendant had
come to 55 Reed Street to purchase, in light of his admission
that he was staying at 55 Reed Street.)

The third strand of evidence consisted of the behavior of
the defendant and his group (i.e., those on the porch) in re-
sponse to the arrival of the police, behavior that was sugges-
tive of an attempt to delay the police, to warn the occupants,
and to reach the apartment, inferentially to assist in conceal-
ing or disposing of the contraband therein. Instead of dis-
persing, they fled *towards* the apartment, shouting warnings
to those above, and shutting doors against the police. Be-
cause the police were so close behind them, there would have
been no time to dispose of the stash, and one can surmise
that the packets on the living room floor, like those discarded
by the defendant in the hall and on the porch, may have rep-
resented a last-second attempt to shed packets carried on
their persons. An inference could properly be drawn by the
jury, however, that the defensive behavior exhibited collec-
tively by the defendant and his group went beyond personally
carried packets and was directed towards protecting the
apartment that contained the stash of cocaine. Behavior of
this type has played a role in many decisions that have held
the defendant sufficiently linked to a stash of narcotics. See,
e.g., *Commonwealth* v. *Dinnall*, 366 Mass. 165, 169 (1974)
("the defendant, seeing the invading officers, endeavored to
slam the door shut"); *Commonwealth* v. *Brzezinski*, 405
Mass. 401, 410 (1989) ("[t]he defendant's retreat into the
closet containing cocaine and cocaine paraphernalia allowed
an inference of consciousness of guilt"); *Commonwealth* v.
*Pratt*, 407 Mass. at 652 and n.7 (delay in opening door and
defensive gestures as police approached contraband). Com-
pare *Commonwealth* v. *LaPerle*, 19 Mass. App. Ct. 424,
426-427 (1985), and, on the facts, *Commonwealth* v. *Arias*,

29 Mass. App. Ct. 613 (1990), further appellate review granted, 409 Mass. 1103 (1991) (defensive behavior by occupants of apartment used as a stash for narcotics).

The totality of the evidence, in the view of a majority of the court, warranted the inference that the defendant knew of the stash of cocaine in the apartment, was carrying cocaine that had come from the stash, and was a joint venturer in the crime of trafficking in cocaine. "Whether an inference is warranted or is impermissibly remote must be determined, not by hard and fast rules of law, but by experience and common sense." *Commonwealth* v. *Drew*, 4 Mass. App. Ct. 30, 32 (1976).

As one who could be found to have assisted knowingly in a trafficking operation, the defendant was properly charged and convicted as a principal. See *Commonwealth* v. *Pope*, 397 Mass. 275, 283 (1986); *Commonwealth* v. *Cook*, 10 Mass. App. Ct. 668, 677 (1980).[9] This was the theory on which the case was submitted to the jury, the judge having ruled that the evidence was insufficient to warrant an inference beyond a reasonable doubt, *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), that the defendant was himself in possession of the cocaine in the apartment except as part of a joint venture. There is no question that one may be found guilty as an accessory to a crime that involves possession as an element. See, e.g., *Commonwealth* v. *Alicia*, 6 Mass. App. Ct. 904, 905 (1978); *Commonwealth* v. *Ramos*, *post* 915, 915-916 (1991). See also *United States* v. *Fischel*, 686 F.2d 1082, 1087 (5th Cir. 1982); *United States* v. *Carter*, 721 F.2d 1514, 1533 (11th Cir. 1984); *People* v. *Ortiz*, 208 Cal. App. 2d 572, 581-582 (1962); *People* v. *Doe-*

---

[9]Although the defendant in *Commonwealth* v. *Pope* was indicted and convicted of being an accessory before the fact to the principal offense, it seems accepted, under G. L. c. 274, § 2, as appearing in St. 1973, c. 529, § 1, that a person indicted as a principal may be convicted on a showing of accessorial, or joint venture, involvement. See, e.g., *Commonwealth* v. *Soares*, 377 Mass. 461, 469-470, cert. denied, 444 U.S. 881 (1979); *Commonwealth* v. *Campbell*, 378 Mass. 680, 689 (1979); *Commonwealth* v. *Whitehead*, 379 Mass. 640, 650-651 (1980); *Commonwealth* v. *Tyree*, 387 Mass. 191, 208 (1982).

*mer*, 35 Mich. App. 149, 151-152 (1971); Annot., Offense of Aiding and Abetting Illegal Possession of Drugs or Narcotics, 47 A.L.R.3d 1239, 1241 (1973). To convict on a theory of accessorial responsibility, it is not necessary to show that the defendant himself possessed the narcotics, either actually or constructively, *United States* v. *Raper*, 676 F.2d 841, 848-852 & n.1 (D.C. Cir. 1982); *United States* v. *Fischel, supra* at 1087-1088; *United States* v. *Wesson*, 889 F.2d 134, 135 (7th Cir. 1989); *United States* v. *Poston*, 902 F.2d 90, 94 (D.C. Cir. 1990), but it is frequently said that it is necessary to show that the defendant aided in the possession and in each other element of the substantive offense. *United States* v. *Fischel, supra* at 1087. *United States* v. *Jackson*, 526 F.2d 1236, 1238 (5th Cir. 1976). *United States* v. *Zapata-Alvarez*, 911 F.2d 1025, 1026 (5th Cir. 1990). In the words of *Commonwealth* v. *Richards*, 363 Mass. 299, 307-308 (1973), "guilt of the accessory is established when it is further shown [i.e., in addition to the commission of a crime] that he intentionally assisted the principal in the commission of the crime and that he did this, sharing with the principal the mental state required for that crime."[10]

Here, we do not know the identity of the principal: i.e., the person or persons who actually or constructively possessed the large cache of cocaine. But it is obvious that someone possessed it, and it is inferable from the quantity — eighty $50 bags — that the intent of the person or persons was distribution. In these circumstances, it is not necessary that the principal or principals be identified or convicted before the person who assisted him or them in the perpetration of the principal crime may be convicted as a joint venturer or accessory. See *United States* v. *Campa*, 679 F.2d 1006, 1013

---

[10]The defendant, apparently thinking of his actions when the police arrived, argues that "it is not enough for the Commonwealth to establish that the defendant was a 'lookout.'" This is not correct. "It is clear that a person who acts as a lookout while others are engaged in a criminal enterprise can be convicted on a joint enterprise theory." *Commonwealth* v. *Saez*, 21 Mass. App. Ct. 408, 411 (1986). In any event, the defendant's involvement here went beyond being a lookout; an inference can properly be drawn that he was himself dealing in cocaine from the stash.

(1st Cir. 1982), and cases cited. "To be sure, there must be a guilty principal before there can be an aider or abettor, but here the proofs connoted plainly enough that somebody was culpable . . . . It was not essential that the principal in the operation be identified so long as someone held that status." *Id.*, quoting from *United States* v. *Staten*, 581 F.2d 878, 887 (D.C. Cir. 1978).

While the evidence was sufficient for the conviction of trafficking in cocaine, the marihuana conviction must be reversed. Nothing in the evidence connected the defendant to the bedroom where it was found. The testimony did not disclose the location of his personal papers or their nature. No marihuana was found on his person. The evidence is at least equally consistent with an inference that the marihuana operation was the separate enterprise of Angela McKenzie and the other woman who were engaged in its packaging when the police arrived. Compare the *Korreckt*, *Davenport*, and *Monson* decisions cited in note 8, *supra*.

The marihuana conviction is reversed and the verdict is set aside. The conviction of trafficking in cocaine is affirmed.

*So ordered.*

GILLERMAN, J. (dissenting, with whom Kaplan,[1] Smith, Fine, Jacobs, Porada, and Greenberg, JJ., join). The defendant James could be found to have had in his possession thirteen bags with 5.08 grams of cocaine (3.31 grams retrieved outside the apartment, and 1.77 grams from the porch), with a street value of $650. An intent to distribute, a required element for each of the two convictions now on appeal, may be inferred from the fact that a person was in possession of a "large" quantity of a drug on the occasion of arrest.[2] How-

---

[1]Mr. Justice Kaplan, an Associate Justice of the Supreme Judicial Court, retired and recalled to active service in the Appeals Court pursuant to statutory authority, joined in the disposition of the case. His term of recall service ended before the opinion was issued.

[2]See *Commonwealth* v. *Rugaber*, 369 Mass. 765, 770 (1976); *Commonwealth* v. *Pratt*, 407 Mass. 647, 650-651, 653 (1990).

ever, 5.08 grams in this case would likely be held not enough to figure as "large," even if the $265 in cash, also found in the defendant's possession, was viewed as a relevant factor,[3] and of course "trafficking" would not be made out. Counsel for the Commonwealth evidently conceived that the problem of raising mere possession to the higher levels could be overcome if a "joint enterprise" were charged to provide a plausible basis for bringing into consideration against this defendant the 29.34 grams of cocaine in the apartment. Elementary trial strategy then called for muddying the water ever so slightly for the confusion of a jury by putting this defendant, Winston James, on trial together with a codefendant, George A. Smith, who was found, along with a stash of cocaine, in the living room of the apartment, and who could be rather easily proved to have an intent to distribute, thus tainting James with guilt of trafficking.

To prove a person a joint venturer or enterpriser with responsibility for a trafficking offense based on possession,[4] it must be shown that the person aided the principals in the possession, knowingly, of more than the required number of grams of cocaine, and shared the mental state required for the offense — here the specific intent to distribute the more than twenty-eight grams of cocaine.[5] It is not enough for joint venture responsibility that the person knew that a crime was to be, or had been, committed by others,[6] or even that the defendant was present when the crime was being committed.[7] Nor is evidence that an accused merely associated with persons who committed the crime sufficient to justify the inference that the accused was a participant.[8] Subsequent concealment of a completed crime does not make one an ac-

---

[3]See *Commonwealth* v. *Wooden,* 13 Mass. App. Ct. 417, 422-424 (1982); *Commonwealth* v. *Tripp,* 14 Mass. App. Ct. 997, 998-999 (1982).

[4]See note 4 to the opinion of the majority. *Ante* at 493.

[5]See *Commonwealth* v. *Richards,* 363 Mass. 299, 307-308 (1973); *Commonwealth* v. *Sinnott,* 399 Mass. 863, 881 (1987); *Commonwealth* v. *Ortiz,* 408 Mass. 463, 466 (1990).

[6]See *Commonwealth* v. *Perry,* 357 Mass. 149, 151 (1970).

[7]See *Commonwealth* v. *Saez,* 21 Mass. App. Ct. 408, 410 (1986).

[8]*Ibid.*

cessory,[9] nor does acquiescence (without more) in the commission of a crime.[10] At the innermost core of joint venture liability is the need to prove that the defendant "somehow participated in committing the offense. . . ."[11] Without knowing participation — without, as Judge L. Hand wrote (see note 11, *supra*) seeking by his own action to make the venture succeed — the defendant (as to whom proof of being a principal in the crime by hypothesis fails) is a mere bystander.

The trial judge understood the doctrine and, bringing it to bear on the crimes in this case, he instructed, as the binding law of the case, that to find the defendant guilty as a joint venturer the Commonwealth would have to demonstrate, beyond a reasonable doubt, that the defendant was "holding it [drugs] jointly for a joint enterprise for distribution purposes," more particularly "that there is actual participation by the participants, by the particular defendant, and that he knew that the cocaine was there, and he knew what was in-

---

[9]See *Commonwealth* v. *Perry, supra* at 151.

[10]See *Commonwealth* v. *Chinn*, 6 Mass. App. Ct. 714, 716 (1978).

[11]See *Commonwealth* v. *Saez, supra* at 410, quoting from *Commonwealth* v. *Amaral*, 13 Mass. App. Ct. 238, 242 (1982); *Commonwealth* v. *Stout*, 356 Mass. 237, 241 (1969) (the defendant must be found to have participated in the venture "as in something that he wishes to bring about, that he seek by his action to make it succeed." — quoting from *United States* v. *Peoni*, 100 F.2d 401, 402 [2d Cir. 1938], in which Judge L. Hand, reversed a conviction for accessorial responsibility because of insufficient evidence of the defendant's participation in the crime. There Judge Hand traced the history of accessorial responsibility from 1790 in American law and from the 14th Century in English law concluding that "[a]ll the words used [in the various statutes and treatises] — even the most colorless, 'abet' — carry an implication of purposive attitude towards [the venture]"); *Commonwealth* v. *French*, 357 Mass. 356, 391 (1970), vacated as to death penalty sub nom. *Limone* v. *Massachusetts*, 408 U.S. 936 (1972) (to be an accessory means "more than mere acquiescence but does not require physical participation, if there is association with the venture and any significant participation in it"; in n.37 at 391 Justice Cutter refers the reader to Perkins, Criminal Law 593 [1957], where emphasis is put on an accessory who is the "brains" of a crime ring). See G. L. c. 274, § 2, and note 9 to the opinion of the majority. *Ante* at 498. See *Commonwealth* v. *Cook*, 10 Mass. App. Ct. 668, 673-674 (1980), noting the differences between accomplice and conspiratorial liability.

tended to be done with it, and that he sought to make the enterprise succeed in some way."

The evidence was so far short of satisfying the instruction that the instruction should not have been given as matter of law.

The Commonwealth's principal witness was Officer O'Mara. He testified that as he and thirteen other police officers approached 55 Reed Street his "first observation" was "a person on the first floor porch . . . . He was standing there." As Officer O'Mara got nearer the house, "people on the porch — one [unidentified] person in particular — began shouting 'hondo' and 'police.' " Officer O'Mara than started running toward the porch, and the defendant "ran towards the door that leads up to the third floor . . . . He slammed the bottom door in my face. I pushed that door open. I chased him up the stairs to the third floor. As I got up to the third floor, he tried to get into the apartment. The door was locked. I could hear people *inside* yelling 'police!' Lock the door. Lock the door." (Emphasis added.) James then dropped several bags of cocaine and retreated to the third-floor porch where he was apprehended by other officers. Officer O'Mara kicked open the third-floor apartment door, went inside and arrested three males, including the codefendant Smith, and three females.

In short, the defendant, whatever he was up to, fled to the third floor where he was confronted with a locked door, Smith on the other side, and not one single word of testimony to connect the two individuals, or to connect James to the stash.

What connects James and Smith, or rather what connects James to the *inside* of the apartment, and therefore to the stash, and therefore to the venture, is entirely a matter of inference. The dividing issue at this point is not so much what is in the record, as what can be drawn from the record. The inferential chain is essentially this. *First strand*, James was "living" in the apartment. This can be inferred from the fact that when booked he said he resided in Florida but that he was "staying at 55 Reed Street" (apartment unmen-

tioned), that he fled to the third-floor apartment along with others who were on the first-floor porch, and that papers of the defendant were found inside the apartment. *Second strand*, the packaging and contents of the bags the defendant discarded were indistinguishable from those found inside the apartment. *Third strand*, the behavior of the defendant "and his group (i.e., those on the porch) in response to the arrival of the police . . . [was] suggestive of an attempt to delay the police, to warn the occupants" etc. This collective behavior permitted the inference that the concerted efforts of the defendant and his group were "directed towards protecting the apartment that contained the stash of cocaine." Such behavior, of which James was a part, and which focused on protecting the stash, effectively linked the defendant to the inside of the apartment.

These are but strands of gossamer. No rational juror would infer that James was living inside the third-floor apartment from James' admission that he was staying, presumably temporarily, at "55 Reed Street," from his *solo* flight[12] to the third-floor apartment from which he was *excluded*, and from the total absence (after a thorough police search) of any personal property or personal papers belong-

---

[12]There is no adequate basis for the majority's statement that the jury could have found that the efforts of James and his group were "directed towards protecting the apartment" or that James "followed others through the door and up the stairs that led to the second and third-floor apartments . . . [and that he] attempted to follow the others into the third-floor apartment . . . ." On cross-examination Officer O'Mara, after suggesting for the first time that some unidentified number of people on the porch "ran up into the apartment," immediately corrected his testimony by admitting that the "only person I saw run was Winston James." Upon further questioning, Officer O'Mara testified that he was only ten feet behind the defendant — just beyond an arm's length — as he chased James up the stairs, and that the first time he saw the codefendant Smith was when he broke into the third-floor apartment. He did not see Smith in the hallway. There was no further testimony of importance on this point. The people on the porch may well have dispersed but, with the exception of James whom O'Mara chased up the stairs, the transcript is silent as to where the people went, who the people were, how many they were, or what, if any, connection they had with James.

ing to James in the apartment.[13] Nor could any rational juror infer from James' possession of five grams of cocaine — merely because of similarity in packaging and content — that James was living in the third-floor apartment or that he knew of the stash of thirty grams inside the apartment.[14] Nor could any reasonably thoughtful juror infer from the fact that "people" (number unknown) were standing on the first-floor porch and, with the approach of the police, evidently disappeared, that James was part of an illicit cabal to protect the stash which, the majority *presumes*, they all knew about, and therefore James knew about.

But even if the majority were granted all these extravagant inferences, it would avail them nothing. Putting James inferentially inside the apartment, even attributing to James knowledge of the stash, does not — as we know from the decisional law, the judge's instructions, and the prosecution's theory of the case — put James in *possession* of the stash (from which one otherwise might infer intent to distribute) because there would still be absent any evidence from which the inference of James' power over or control of that stash

[13]The majority insists on the existence of such papers in the apartment, but concede that the testimony does not disclose "the nature of these papers or the place or places in the apartment where they were found." *Ante* at 493. A more appropriate concession might have been to state that *no* papers of the defendant were found in the apartment, that the one isolated suggestion in the record that papers of James were found in the apartment was based on an obvious error in the transcript.

[14]The majority claims that the packaging and the contents of the bags found outside the apartment were "indistinguishable" from those found inside the apartment, and that that permits the inference of James' "connection to the stash" in the third-floor apartment. There is nothing in the record to suggest other than that the similarity was attributable to the *absence* of any distinguishing markings. Distinctive packaging (not present here) sensibly permits the inference of intent to distribute, rather than the inference of knowledge of the amount of another's entire stash. See *Commonwealth* v. *Pratt*, 407 Mass. 647, 653 (1990). Moreover the cases cited in note 8 to the opinion of the majority merely present the issue of whether the evidence was sufficient to permit the inference of possession or constructive possession, not the quantum of evidence necessary for a finding of accessorial responsibility. *Ante* at 496. *Commonwealth* v. *Brown*, 12 Mass. App. Ct. 988 (1981), also cited by the majority, addressed the former issue. *Ante* at 495.

could be drawn. *Commonwealth* v. *Pratt*, 407 Mass. 647, 651 (1990); *Commonwealth* v. *Ramos, post* 915 (1991). This much is conceded, by the Commonwealth and by the majority.

The heart of the matter, as we have said, is *participation* in the illicit venture, and it is precisely there that the majority's case evaporates. There was a failure of proof that James participated in the crime of trafficking by providing substantial assistance to the enterprise of collecting and possessing, with intent to distribute, more than twenty-eight grams of cocaine. The cases cited by the majority illustrate what is missing in the Commonwealth's case herein. In each instance where a defendant was found to be an accomplice in such a possessory offense, the defendant either (a) assisted in obtaining the drug for the principal,[15] (b) exercised control over a drug deal by directing a partner to convey the drug to a buyer,[16] or (c) lent his residence to another to be used to store and conceal the drugs.[17] In all the cases, the defendant

[15]*United States* v. *Carter*, 721 F.2d 1514, 1534 (11th Cir. 1984) (defendants provided transportation, security, and protection payments to police for principals who were involved in marihuana smuggling); *People* v. *Doemer*, 35 Mich. App. 149, 153 (1971) (defendant was driving truck used to pick up marihuana shipment). See also *United States* v. *Wiebold*, 507 F.2d 932, 934 (8th Cir. 1974) (defendant shipped LSD to a trafficker and then received a portion of the proceeds after it was sold; on one occasion he accompanied the trafficker on a car trip to deliver LSD to where it was being sold). Federal cases cited in notes 16, 17, and 18 are based on the "aiding and abetting" provisions of 18 U.S.C. § 2, the common law root of which is accessorial liability.

[16]*Commonwealth* v. *Alicia*, 6 Mass. App. Ct. 904, 905 (1978) (defendant procured a buyer for heroin, then directed his accomplice, who possessed it, to bring the heroin for delivery); *United States* v. *Fischel*, 686 F.2d 1082, 1088-1089 (5th Cir. 1982) (defendant helped procure a buyer, and exercised some control over the drug when the deal was consummated). See also *United States* v. *Raper*, 676 F.2d 841, 849 (D.C. Cir. 1982) (defendant arranged a sale of heroin, and directed an accomplice to turn the narcotics over to a buyer). Contrast *United States* v. *Jackson*, 526 F.2d 1236, 1238 (5th Cir. 1976) (conviction for aiding and abetting possession with intent to distribute reversed where defendant merely located a buyer for a dealer, but was not present when the transaction took place).

[17]*People* v. *Ortiz*, 208 Cal. App. 2d 572, 579-580 (1962) (defendant kept personal belongings in, supplied equipment for, spent significant time in, and paid the bills for residence where heroin was found; defendant also

not only had knowledge of the entire quantity of drugs involved, but actually "aid[ed the principal in its] possession."[18] In the present case there is no evidence that the defendant procured the quantity in the apartment for any principal, or controlled the premises where it was found, or had any hand in the storage, concealment, or disposition of the more than twenty-eight grams.[19] In sum, there is no evidence from which a rational juror could find that James actively participated in and assisted a trafficking operation — a requirement the majority concedes.

We note, finally, that the majority take pains to assert that a lookout may be convicted on a joint enterprise theory. Perhaps this is so, but there is nothing to support the idea that the defendant was serving as a lookout.[20] There was no testimony that he was among those who shouted "hondo" or "police." He was first seen on the first-floor porch (perhaps where he was staying), and with the arrival of the police raced to the third floor with five grams of cocaine in his

---

attempted to prevent police from entering the building and shouted "look out, here they come" from inside the building). See also *United States* v. *LaGuardia*, 774 F.2d 317, 319 (8th Cir. 1985) (defendant was *lessee of apartment* where drugs were found, possessed weapons in her purse used by drug dealers, had $10,000 hidden among her clothes, and had cocaine hidden in her bedroom).

[18]*United States* v. *Fischel*, 686 F.2d at 1088.

[19]Even if James purchased the five grams of cocaine from those in control of the stash, absent evidence from which a rational juror could infer that James *knew* of the twenty-eight gram stash and intended to participate in its distribution, the purchase does not yield accessorial responsibility.

[20]The majority quotes language from *Commonwealth* v. *Saez*, 21 Mass. App. Ct. 408, 411 (1986), to the effect that a lookout may be convicted on a joint enterprise theory. This is certainly an accurate statement, but it is inapposite to the facts here. To the extent that James was shown to be a lookout, there is no evidence as to what he was guarding against. Given that he was found in possession of his own personal quantity of cocaine, the facts imply no more than that he was looking out for his own safety, or perhaps those on the porch with him. Compare *Commonwealth* v. *Santiago*, ante 207, 218 (1991) (defendant convicted on joint venture theory where he spent three days in a hotel room near his house with two coconspirators where numerous overseas phone calls were made, the three left in a vehicle, defendant acted as a lookout from rear window as car was being followed by the police, cocaine was later found in the trunk of the car).

pocket. At the very most "that merely places the defendant at the scene of the crime and shows him to be in association with the principals," but we have held that is not enough for conviction. *Commonwealth* v. *Saez*, 21 Mass. App. Ct. 408, 411 (1986). The "Commonwealth must present additional evidence which implicates the defendant in the crime." *Ibid.* The majority has impermissibly stacked inference upon inference, see *Commonwealth* v. *Mazza*, 399 Mass. 395, 399 (1987) ("We are not permitted to pile inference upon inference"), but no rational inference from the facts of this case will supply the only conclusion that counts: that James was a deliberate participant in the crime of trafficking.

The majority is content to leave the question of guilt to a jury. But there is no such thing as trial by jury; trial is by judge and jury, and the judge may not abdicate responsibility to rule in the first place whether there is a case to be submitted to the jury. Here there was nothing for the jury with respect to the major offenses charged.

Winston James was justly and deservedly convicted of possessing 5.08 grams of cocaine; the matter ought to have ended there.